**In re LONG CHEVROLET, INC., Debtor.**

**No. 82 C 4993.**

United States District Court, N.D. Illinois, E.D.

Oct. 13, 1987.

Robert B. Chatz, Arvey, Hodes, Costello & Burman, Chicago, Ill., for debtor-appellant.

Gail E. Meyers, J. Samuel Tenenbaum, Becker & Tenenbaum, Chicago, Ill., for General Motors Acceptance Corp.

## MEMORANDUM OPINION

GRADY, Chief Judge.

This is an appeal from the bankruptcy court's interlocutory order granting a creditor of Long Chevrolet, General Motors Acceptance Corporation ("GMAC"), a perfected security interest in funds remaining in the hands of the trustee under Long Chevrolet's pension fund, in the cash surrender value of a life insurance policy, and in the proceeds from the sale of certain real estate. For the reasons stated below, we affirm the decision of the bankruptcy court.

## FACTS AND PROCEDURAL BACKGROUND

The following outline of the facts is from a previous opinion on this appeal. Long Chevrolet ("Long"), prior to commencement of this Chapter 11 case, was engaged in the business of selling and servicing new and used cars.[1] Long's principal creditor is GMAC. On November 10, 1981, GMAC, alleging that Long had defaulted on its obligations to GMAC, filed in this court an action for replevin of Long's inventory pursuant to alleged security interests in the property. A writ of replevin issued and GMAC repossessed approximately 1,100 vehicles, forcing Long to close its doors. Long filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 30, 1981.

On February 10, 1982, after protracted negotiations among Long, its Unsecured Creditors' Committee ("the Committee") and GMAC, the bankruptcy court, with GMAC's consent, granted Long permission to use approximately $300,000 in cash collateral in which GMAC claimed an interest. On March 31, 1982, the cash collateral order expired by its terms, and GMAC refused to consent to an extension. Long thereafter presented a proposal to the Committee for reopening its business as a used car facility in order to rehabilitate itself and form the basis for a plan of reorganization. Long proposed to use certain funds which it believed to be unencumbered assets of its estate. These funds included $187,000 in the trust established to fund Long's pension plan (the pension plan had been overfunded), the cash surrender value of a life insurance policy on the life of Long's president, and the proceeds from the proposed sale of certain real estate in Villa Park, Illinois. Pursuant to this business plan, on May 13, 1982, Long filed an application for authority to use these funds to reopen its used car facility. GMAC objected to the application, claiming that it had a security interest in the funds. The bankruptcy court entered an order granting GMAC a perfected property interest in the funds. *See In re Long Chevrolet, Inc.*, No. 82 C 4993, Memorandum Op. at 1–2 (N.D.Ill. Jan. 4, 1983) (Grady, J.) ("January 1983 Opinion").

Long moved for leave to appeal the bankruptcy court's interlocutory order. We granted that motion under 28 U.S.C. § 1334(b), reasoning that deciding the appeal would materially advance the ultimate termination of the litigation. January 1983 Opinion at 4. Unfortunately, nearly four years have passed since that decision, as GMAC and Long have repeatedly asked the court to refrain from ruling on the appeal pending the outcome of settlement negotiations. Inasmuch as these negotiations

---

1. Long's dealership was well-known in the Chicago area, primarily because of its advertising. One noteworthy series of television commercials featured a small child dressed in newsboy garb, extolling the virtues of Long's business by shrieking, "EXTRA! EXTRA! Read all about it!" in a voice that could charitably be described as grating. However, area viewers experienced a vicarious triumph in one of the newsboy's last commercials, in which his inane spiel was interrupted by a well-aimed cream pie to the face.

have failed to resolve any of the issues raised in the appeal, we now address the merits of the appeal.[2]

## DISCUSSION

The security interests upon which GMAC rests its claim to the property at issue in this appeal are derived from two security agreements signed between Long and GMAC; the first dated February 11, 1980 (GMAC Brief, Exhibit 7) and the second dated July 16, 1981, (*id.*, Exhibit 8). We will refer to these documents as the "February 1980 Agreement" and the "July 1981 Agreement." We will refer to the bankruptcy court's decision (*In re Long Chevrolet*, No. 81 B 14883), Memorandum and Order (Bankr. N.D.Ill. July 9, 1982) (James, Bankr. J.) as "Order."

### Standard of Review

In reviewing the decision of a bankruptcy court, a district court will not set aside the bankruptcy court's findings of fact unless "clearly erroneous." However, where the issues on appeal are legal, the district court may review *de novo* and reach conclusions independently. *In re Ebbler Furniture & Appliances, Inc.*, 804 F.2d 87, 89 (7th Cir.1986). The controlling issues in this appeal are legal, but we defer to whatever factfinding was done by the bankruptcy court.

### Residual Pension Plan Assets

The bankruptcy court ruled that the February 1980 Agreement's grant of a security interest in "general intangibles" covers Long's right to a refund for overpayments to its employee pension plan upon termination of the plan. Order at 3. Long does not appear to contest that the Agreement purports to grant such an interest. Rather, it argues that Long could not have granted an interest in its pension refund because the assets involved are subject to the regulations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and that ERISA preempts GMAC's rights to the refund assets as a secured creditor, rights derived from state commercial law. Alternatively,

Long contends that even if the grant of such an interest is not void under ERISA, Long did not have any rights in the residual pension assets until all the employees had received their accrued benefits upon termination of the plan (February 22, 1982) or at least not until the Pension Benefit Guaranty Corporation (PBGC) fixed the amount of residual assets belonging to Long (November 21, 1981). Because Long filed its petition for bankruptcy on November 30, 1981, it argues that the rights in that collateral had not accrued to Long before the 90-day "preference period" prior to the filing and that Long's "transfer" of the interest to GMAC may be avoidable by the trustee in bankruptcy, either as a post-petition transfer under 11 U.S.C. § 549 or a transfer within the preference period under 11 U.S.C. § 547. Finally, Long argues that GMAC did not perfect its security interest in the refund to defeat the claim of the trustee, whose status as the "hypothetical lien creditor" under 11 U.S.C. § 544(a) is sufficient to defeat the claims of creditors with unperfected security interests.

### 1. ERISA Pre-emption

■ According to Long, in any matter which relates to a pension plan, ERISA and case law developed under ERISA govern to the complete exclusion of state law, including state laws governing secured transactions. Long Brief at 22. We believe that this is an overly broad interpretation of ERISA's pre-emptive effect. ERISA supersedes state laws insofar as they "relate to" any employee benefit plan. 29 U.S.C. § 1144(a). The Supreme Court has stated that "the words 'relate to' should be constructed expansively: '[a] law relates to an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" *Fort Halifax Packing Co., Inc. v. Coyne*, — U.S. —, 107 S.Ct. 2211, 2215, 96 L.Ed.2d 1 (1987) (quoting *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–3000,

**2.** After briefing had been completed, David Abrams was appointed trustee in bankruptcy. Abrams moved to adopt Long's original briefs as his own and we allowed that motion. Although the trustee is the party in interest at this point, we will refer to the appellant simply as "Long."

77 L.Ed.2d 490 (1983)). "To interpret [§ 1144(a) ] to pre-empt only state laws specifically designed to affect employee benefit plans would be to ignore the remainder of [§ 1144]," which provides that ERISA does not pre-empt some enumerated categories of state law, such as criminal statutes. *Shaw,* 463 U.S. at 98, 103 S.Ct. at 2900.

In *Shaw,* the Court held that state laws prohibiting employers from structuring employee benefit plans in a manner that discriminates on the basis of pregnancy and requiring specific benefits for disabled workers "clearly 'relate to' benefit plans" and were pre-empted by ERISA. *Shaw,* 463 U.S. at 97, 103 S.Ct. at 2900. However, the Court noted, "Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Id.* at 100 n. 21, 103 S.Ct. at 2901 n. 21. In *Fort Halifax,* the Court ruled that a Maine statute requiring employers to provide a one-time severance payment to employees in the event of a plant closing was not pre-empted, because the statute neither established nor required an employer to maintain an employee welfare benefit plan. Following the Maine law would not force employers to administer contradictory or conflicting benefit plan schemes. 107 S.Ct. at 2218–19. The Court stated that Congress pre-empted state laws relating to *plans* as opposed to laws relating only to benefits because "[o]nly a plan embodies a set of administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulation." *Id.* at 2217.

We cannot conclude, in the wake of *Fort Halifax* and *Shaw,* that a state law allowing for the grant of security interests in property "relates to" the employee benefit plan at issue here. As enacted in Illinois, Article 9 of the Uniform Commercial Code (UCC), which governs secured transactions, is a law of general application lacking "connections with" or "references to" employee benefit plans. Long has not identified any provision or purpose of ERISA that is in any way inconsistent with the general commercial law principles of Article 9. The

fact that a secured transaction may in some way involve assets derived from a pension plan is too tenuous a link to support pre-emption.

We think it apparent that there are some instances in which ERISA's regulation of employer conduct with regard to employee benefit plans will indeed supersede a commercial law of general application. Here, had Long pledged *all* the assets of the pension plan, including those derived from the contributions of employees, ERISA's "exclusive benefit rule" might bar such a security agreement because "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). However, this "exclusive benefit rule" applies "except as provided ... under sections 1342 and 1344 of this title (relating to termination of insured plans)." Section 1344(d), in turn, provides that residual assets may be distributed to the employer if the liabilities to participants have been satisfied. We do not see anything in ERISA that expressly or impliedly prohibits an employer from granting a security interest in its expected residual assets, nor do we think that such a transaction would, without more, contravene public policy.

The regulatory goal of ERISA is that plan assets are to be held in trust and that the employer as fiduciary is not to use the plan assets for its own benefit. *See* 29 U.S.C. § 1104(a)(1)(A). This case deals with the employer's right to a refund of its excess contributions to a benefit plan. As GMAC points out, nothing in ERISA's fiduciary provisions (29 U.S.C. §§ 1102–12) prohibits an employer from granting its right to a refund upon termination of a pension plan to a secured creditor. Section 1344(d)(1)(C) allows the employer to reserve its right to excess contributions in the pension plan contract. In this case, Long so reserved its right. Pension Plan at ¶ 11.07 (Long's Brief, Exhibit B). The "intangible" refund right belongs to the employer under both statute and contract, and there is no

reason to prevent the employer from alienating that right. In *Federal Deposit Insurance Corp. v. Marine Nat'l Exchange Bank of Milwaukee*, 500 F.Supp. 108 (E.D. Wis.1980), the FDIC had been appointed receiver of a failed bank. The bank's employee pension plan terminated and a surplus of $200,000 remained. The FDIC, standing in the shoes of the employer bank, claimed that surplus against the pension plan's trustee. The court stated, "Because the bank had the right to the surplus before it became insolvent, the FDIC as the receiver had that right after insolvency. The FDIC also had the right to sell this asset pursuant to the liquidation of [the bank]." *Id.* at 110.

Long argues that allowing employers to grant security interests in a pension plan's residual assets creates a conflict of interest in violation of ERISA's fiduciary mandate to act exclusively for the benefit of the participants. The scenario Long describes is complex. As employer, Long had the right to amend, terminate, and interpret the plan under the plan contract. Pension Plan at ¶¶ 11.02, 11.05, 16.04, 16.05. Long now asserts that the company could thereby manipulate the amount of money in the surplus and terminate the plan to meet the demands of its creditors while shirking its fiduciary duty to act for the exclusive benefit of the plan participants.

This situation is no more "conflictual" for an employer than the normal day-to-day administration of an employee benefit plan where the employer has not granted a security interest in its refund right; in such a situation, unsecured creditors could pressure the employer to underfund the plan so that additional money would be available to satisfy the employer's debt. The employer could defraud both creditors and plan participants by overfunding the pension fund with collateral and then terminating the plan, keeping the refund for its own use. In any event, Long has not stated that GMAC as creditor engaged in this conduct

or that Long terminated the plan under pressure from GMAC.

We conclude that Illinois' secured transactions law is not pre-empted by ERISA and that the grant of a security interest in an employer's right to a refund is neither a violation of ERISA nor void as against public policy. We move on now to the bankruptcy law question of whether Long's grant of the security interest in the refund may be subject to avoidance by the trustee as a preferential or post-petition transfer under 11 U.S.C. § 547 or § 549.

### 2. Validity of the "Transfer"

■ Under the bankruptcy code, the time at which a security interest is "transferred" to a creditor may determine the priority of the creditor's claim as against the trustee. If the transfer does not occur until after the bankruptcy petition is filed, the security interest may be avoided by the trustee and the claim relegated to the status of a general unsecured claim under § 549(a). If the transfer occurs within 90 days prior to the filing of the petition, the claim may constitute a preference which could possibly be avoided by the trustee under § 547.[3]

A "transfer" does not occur until "the debtor has acquired rights in the property transferred." 11 U.S.C. § 547(e)(3). We must therefore determine when Long acquired rights in the refund. Long claims that because § 1344(a)(1) of ERISA prevents the distribution of residual assets to the employer any time before all liabilities of the plan to the beneficiaries have been satisfied, Long did not acquire its "right" to the refund until February 22, 1982, when the final distributions to the beneficiaries were made. Alternatively, Long states that the earliest the transfer could have occurred is November 21, 1981, when the PBGC issued a notice of sufficiency giving the trustee permission to distribute the trust assets. GMAC counters that Long transferred the interest in the February 1980 Agreement because Long had at that

**3.** Both sides allow that the final determination of whether GMAC's interest could be avoided by the trustee was not argued before the bankruptcy court and not determined by that court. We

therefore address only the question of when GMAC's interest attached to determine whether either § 547 or § 549 is available to the trustee on remand. We conclude that they are not.

time a statutory and contractual right to receive any surplus.

Section 547(e)(3) of the bankruptcy code was enacted by Congress to overrule the "floating liens" theory enunciated in cases such as *Grain Merchants of Indiana, Inc. v. Union Bank & Savings Co.*, 408 F.2d 209 (7th Cir.1969). "A creditor with a security interest in a floating mass, such as inventory or accounts receivable, is subject to preference attack to the extent he improves his position during the 90–day period before bankruptcy." H.Rep. No. 595, 95th Cong., 2d Sess. 374, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6330.

We think that the debtor, Long, had a contractual and statutory right to the refund at the time it granted the security interest to GMAC and that the "transfer" therefore occurred in February 1980. The fact that Long had to wait for the PBGC to approve the allocation of the funds upon termination of the plan and then had to wait for those funds to be distributed does not mean it had no right to that property prior to that time. Section 547(e)(3) was designed to allow the trustee in bankruptcy to avoid transfers where the debtor acquired the property while insolvent. Such was the case in *Grain Merchants*, where the security interest had been granted in the debtor's accounts receivable. In explaining why *Grain Merchants* was no longer good law after the enactment of § 547(e)(3), the Seventh Circuit stated, "[T]he filing of financing statements did not transfer ownership of the debtor's future accounts receivable; that debtor would acquire some rights in the future accounts receivable when the accounts receivable came into existence." *In re Coppie*, 728 F.2d 951, 953 (7th Cir.1984), *cert. denied sub nom, Gouveia v. Hammond Clinic*, 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 772 (1985). In *Coppie*, the debtor's wages had been garnished within the 90–day preference period subject to a court order entered prior to the commencement of the preference period. The court held that the transfer occurred at the time of the court order, not when the wages were actually garnished, because under the ap-

plicable Indiana law, the debtor's rights in his future wages were irrevocably lost at the time of the court order. *Id.* at 953.

The law establishing Long's right to a refund is § 1344(d) of ERISA, and under that law and the pension plan contract, Long's right to the refund was fixed as of February 1980 when it granted the security interest. The refund right did not "wait" to come into existence, such as an account receivable. In *In re Kendrick & King Lumber, Inc.*, 14 B.R. 764, 32 U.C.C.Rep. Serv. (Callaghan) 575 (Bankr.W.D.Okla. 1981), the debtor granted a creditor a security interest in its tax refund, which the government issued to the debtor one day after the bankruptcy petition was filed. The trustee argued that prior to the issuance of the check, the debtor's right to the tax refund had been "inchoate and contingent" and that transfer did not take place until the checks were issued. The court disagreed, holding that the refund right was property in which the debtor had a transferrable right prior to the commencement of the 90–day preference period. *Id.* at 767, 32 U.C.C.Rep.Serv. (Callaghan) at 579. As in *Kendrick & King*, Long acquired the right to its refund prior to granting the security interest to GMAC and the transfer therefore occurred well in advance of the filing of the petition or the preference period.

Long points to *In re Diversified World Investments, Ltd.*, 12 B.R. 517 (Bankr.S.D. Tex.1981) for the proposition that the transfer did not occur until Long received the payout of funds. In *Diversified*, the debtor leased an aircraft to a third party lessee. The debtor then assigned rental payments to the creditor prior to the preference period. When those payments became due, the lessee paid the creditor directly, but those payments were made within the preference period. After filing, the trustee brought an adversary proceeding to recover these payments. The court held that the transfer was not made until the rent payments were due to the debtor and simultaneously paid to the creditor, and the creditor's motion to dismiss the adversary proceeding was denied.

One bankruptcy commentator has criticized *Diversified:*

> Under the court's reasoning, section 547(e)(3) would provide the trustee with a potent weapon for avoiding legitimate security arrangements, a result not intended by Congress. In fact the debtor had assigned its interest in the rentals long before bankruptcy and had nothing to transfer during the 90–day preference period.

4 *Collier on Bankruptcy,* ¶ 547.17[7] at 547–67 (1987 ed.). We agree with this criticism and decline to follow *Diversified.* We hold that the "transfer" of Long's right to the refund occurred on February 11, 1980, and that the trustee's avoiding powers under §§ 547 and 549 are not called into play.

### 3. Perfection of the Interest

■ To withstand challenge by the trustee, a transfer must not only be made before the 90–day preference period, but must also be perfected by the creditor when the transfer is made or within 10 days thereafter. 11 U.S.C. § 547(e)(2)(A). Under § 544(a), the trustee has all the rights of "a creditor that extends credit to the debtor ... and that obtains [at the commencement of the case] with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such a creditor exists." The trustee, as a "hypothetical lien creditor," takes priority over the holder of an unperfected security interest as a matter of state law—in Illinois, that controlling law is the UCC. Ill.Rev.Stat. ch. 26, ¶ 9–301(1)(b); 4 *Collier on Bankruptcy* at ¶ 544.02.

It is well established that the trustee's priority as hypothetical lien creditor over another claimant is a matter of state law. *In re Chaseley's Foods, Inc.,* 726 F.2d 303, 307 (7th Cir.1983). In Illinois, that state law is the UCC. However, Long argues that because ERISA pre-empts general state commercial law, this court should not apply the UCC but rather "federal common law governing perfection." Long's Brief at 40. As we have already determined that ERISA does not pre-empt application of the UCC, we will apply that law as enacted in Illinois to determine whether GMAC perfected its interest.

GMAC mistakenly argues that its interest was "perfected pursuant to § 9–203 of the Illinois Commercial Code." That section covers "attachment," not "perfection." A security interest "attaches" when it becomes enforceable against the debtor with respect to the collateral. Ill.Rev.Stat. ch. 26, ¶ 9–203(2). This occurred on February 11, 1980, when the debtor (Long) signed the security agreement, gave value, and had rights in the collateral. *Id.* at ¶ 9–203(1). At that point, GMAC could enforce its claim against Long—its security interest had "attached."

Perfection, however, is something more. Perfection makes GMAC's interest enforceable over the claims of third parties, such as the trustee in bankruptcy. The circular definition of ¶ 9–303(1) is not particularly edifying: "A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken." However, filing is the only proper way of perfecting a security interest in the type of property at issue here, "general intangibles." 9 *Anderson on The Uniform Commercial Code,* § 9–302:27 at 82 (1985); *York v. Ottusch,* 412 F.Supp. 819 (W.D.Wis.1976). In reviewing the record (neither party addressed the issue of filing in the briefs) we note that a large number of UCC filing statements are appended to Long's original Application for Authority to Use Cash Collateral. GMAC Brief, Exhibit 3 at 10–13, 21. In that Application, Long stated that it acknowledged the "validity, perfection, and priority of the security interests of GMAC in ... general intangibles." *Id.* at 2. It is apparent that GMAC perfected its security interest by filing in accordance with Article 9 of the UCC. We hold that GMAC's security interest was perfected in a manner which defeats the trustee's potential § 544(a) claim. We affirm the decision of the bankruptcy court that GMAC has a valid security interest in the pension refund.

### Life Insurance Policies

The bankruptcy court ruled:

Long expressly granted to GMAC on February 11, 1980 and on July 16, 1981 a security interest in all policies and certificates of insurance. Although the UCC does not apply to this transaction the court believes that it does properly set forth the standard of sufficiency of description to use in determining whether there has been as [sic] assignment of this insurance. As has been noted a description is sufficient if it reasonably identifies what has been described. The documents do.

Order at 4–5. Long argues that the purported grant of "security interests" in the "policies and certificates" of insurance were only made with respect to casualty insurance, the only type of insurance covered by Article 9 of the UCC. *See* Ill.Rev. Stat. ch. 26, ¶¶ 9–104(g), 9–306. Both the February 1980 and July 1981 Agreements state that Long is required to obtain casualty insurance payable to GMAC. The Agreements also provide generally that GMAC will have the remedies of a secured creditor under the UCC in the event of Long's default. February 1980 Agreement at ¶ 11; July 1981 Agreement at ¶ 9. Long also maintains that it assigned five other life insurance policies to GMAC in separate assignments, indicating that it was not the intent of the parties to include life insurance in the security agreements. Long finally argues that the general language "all policies and certificates of insurance" is insufficiently specific to constitute a valid assignment.

GMAC agrees that the UCC does not allow for the grant of a security interest in life insurance policies but states that it gained rights in the policies as an assignee, which is expressly permitted by Illinois law. Ill.Rev.Stat. ch. 73, ¶ 857.1. GMAC supports the bankruptcy court's interpretation of the contract, arguing that the plain language "all policies and certificates of insurance" cannot be construed as limited to casualty insurance.

■ We agree with the bankruptcy court's interpretation of the security agreements. The fact that Article 9 of the UCC does not apply to life insurance policies does not mean that such policies cannot be used as collateral; "[T]he draftsmen [of the UCC] felt that such transactions are adequately covered by existing law and do not fit within the framework of Article 9." Ill.Ann.Stat. ch. 26, ¶ 9–104 (Smith–Hurd 1974) (Illinois Code Comment at 51). Under the existing non-UCC law, life insurance policies may be assigned to creditors. Ill.Rev.Stat. ch. 73, ¶ 857.1. Contracts assigning insurance policies are governed by principles of general contract law. *Employers Modern Life Co. v. Lindley*, 83 Ill.App.3d 394, 39 Ill.Dec. 445, 404 N.E.2d 1036 (5th Dist.1980). Under those principles, "The well-established rule is that no particular form of words is necessary to create a valid assignment. Any words that demonstrate the intent to transfer some identifiable property from the assignor to the assignee for valuable consideration are adequate to accomplish an assignment." *In re Estate of Martinek*, 140 Ill.App.3d 621, 94 Ill.Dec. 939, 944, 488 N.E.2d 1332, 1337 (2d Dist.1986).

■ Given this standard, we agree with the bankruptcy court that the agreements manifest an intent to assign Long's interest in the life insurance policies to GMAC. A contract is to be interpreted so as to acknowledge significance of each of its parts. *White v. White*, 62 Ill.App.3d 375, 19 Ill. Dec. 380, 378 N.E.2d 1255 (1st Dist.1978). The contracts cover "all" of Long's insurance policies. The agreements subsequently address specific provisions for casualty insurance on Long's property. These specific provisions bolster the interpretation that the general assignment of "all policies" to GMAC has to mean more than just casualty insurance; otherwise, the general assignment would be superfluous.

■ The language of an assignment need only be specific enough to render its subject matter capable of identification. *Hogan v. Dalziel*, 40 Ill.App.2d 19, 188 N.E.2d 367, 372 (2d Dist.1963). Long cites the case of *Material Service Corp. v. Bogdajewicz*, 69 Ill.App.3d 742, 26 Ill.Dec. 227, 387 N.E.2d 1057 (1st Dist.1979), in support of its argument that the grant of "all policies and certificates of insurance" is too

vague to sufficiently describe the property assigned. In *Material Service*, the court determined that describing collateral as "certain land trusts ... described in Exhibit A," where Exhibit A was never attached to the agreement, was insufficient to create a security interest. Left with only the grant of "certain" trusts, it could not be discerned which of the debtor's trusts the parties intended to include. In contrast, the identity of insurance policies assigned here is not in doubt—all of Long's policies were included.

█ Finally, we agree with GMAC that the subsequent assignment of other individual life insurance policies by Long does not affect the plain language and intent of the February 1980 and July 1981 Agreements. Those subsequent assignments would alter the previous contracts only to the extent that such alteration was expressed or their terms were in conflict. *Cf. Harris Trust & Savings Bank v. Chicago Title & Trust*, 84 Ill.App.3d 280, 39 Ill.Dec. 658, 662, 405 N.E.2d 411, 415 (2d Dist.1980) (executory contract is not "merged" in subsequent agreement executed in only part performance of its provisions, but remains in full force and effect as to provisions not performed). Those insurance policies that were not later specifically assigned remain covered by the "all policies and certificates" language of the February 1980 and July 1981 Agreements.

### Villa Park Property

Long's objections to GMAC's assertion of a security interest in real property located in Villa Park, Illinois, are similar to those raised in opposition to the life insurance interest. Long contends that the bankruptcy court misconstrued the security agreement and that the general description of the real property involved is insufficient to confer an enforceable security interest to GMAC.

█ The operative language of the July 1981 Agreement for purposes of this issue is found in paragraph 2, in which GMAC is granted a security interest covering, among other things:

(c) All of the Dealers/Debtor's rights, powers, privileges and beneficial interests under the Trust Agreement dated the 11th day of February, 1980 with the First National Bank of Lake Forest, as Trustee and known as Trust No. 6350; and

(d) All of the Dealers/Debtor's rights, power, privileges and beneficial interests under any other trust agreements; and

(e) The proceeds of the foregoing.

The bankruptcy court concluded that "Long intended GMAC to have a security interest in the beneficial interest of the land trust and used words sufficient to grant that interest." Order at 6. Long makes much of the fact that the bankruptcy court relied on paragraph 2(c), relating to Trust No. 6350, in finding that Long intended to grant a security interest in the Villa Park property. As Long points out, Trust No. 6350 does not include the Villa Park property. Long's Brief at 50–51. We agree with Long that Trust No. 6350 has no relation to the Villa Park property and that the bankruptcy court erred in basing its decision on the grant of interest in that trust.

█ However, this error does not require reversal. Paragraph 2(d) of the July 1981 Agreement, standing alone, is sufficient to establish GMAC's interest in the Villa Park property and allows us to uphold the result reached by the bankruptcy court. Long objects that the language of that paragraph is not specific enough to grant an enforceable interest in the property. Here, the issue is governed by the Uniform Commercial Code, which applies to security interests in real property. "For purposes of this Article any description of personal property or real estate is sufficient whether or not it is specific, if it reasonably identifies what is described." Ill.Rev.Stat. ch. 26, ¶ 9–110. A general grant of "all ... beneficial interests under any other trust agreements," when made without exceptions, is sufficient to describe particular property within that category. *Cf. In re Little Brick Shirthouse, Inc.*, 347 F.Supp. 827 (N.D.Ill.1972).

Long again relies on *Material Service* to contest the sufficiency of the language, but the case is distinguishable for the same reasons we articulated above. The creditor in that case took a security interest in "certain" land trusts to be enumerated in an attachment to the security agreement that was not attached. Obviously, "certain trust agreements" is an inadequate description because the phrase could refer to one, some, or all of the trust holdings. The inadequacy of the description was not that no trust numbers were included or that no specific parcels of property were designated; it fell short because it did not indicate which of the debtor's trusts were within the agreement and which were not. Here, *all* of Long's trust agreements, including the one covering the Villa park property, are covered. No guesswork is necessary. We affirm the bankruptcy court's decision that GMAC has a security interest in the Villa Park property.[4]

**CONCLUSION**

The decision of the bankruptcy court is affirmed.

---

**4.** The bankruptcy court, as further support for its conclusion that Long intended to grant the property, referred to a mortgage taken by Long on the Villa Park property subsequently to the July 1981 security agreement. According to the bankruptcy court, Long took this mortgage to further secure payment of its debt to GMAC. Long argues that this mortgage is insufficiently specific to give notice and unauthorized because Long was merely the holder of the beneficial interest in the property and the mortgage should have been executed by the land trustee. Long's Brief at 55–59. Because we hold that the July 1981 Agreement, standing alone, granted GMAC an enforceable security interest in the property, we affirm the decision of the bankruptcy court without addressing these contentions.