**In re STUDIO FIVE DESIGNS (USA), INC., Debtor.**

**M. NOLDEN, Trustee of the Estate Studio Five Designs (USA), Inc., Plaintiff,**

**v.**

**BALZER/SHOPES, INC., Defendant.**

**Bankruptcy No. 4–87–03107 JN5.**

**Adv. No. 4–87–0363 AJ.**

United States Bankruptcy Court, N.D. California.

Aug. 1, 1988.

William S. Klein, Hopkins, Mitchell & Carley, San Jose, Cal., for defendant.

Robert L. Ward of Law Offices of Robert L. Ward, Oakland, Cal., for plaintiff.

M. Nolden, Oakland, Cal., Trustee.

## MEMORANDUM OF DECISION

LESLIE TCHAIKOVSKY, Bankruptcy Judge.

Defendant Balzer/Shopes, Inc. ("Balzer") moves for summary judgment in its favor against Plaintiff (the "Trustee") and dismissal of the instant preference action. For the reasons stated below, the motion is granted.

## SUMMARY OF FACTS

There are no material facts in dispute. The facts are as follows:

Prior to the filing of its bankruptcy petition, the debtor (the "Debtor") was indebted to Balzer in the principal amount of $39,200.49. On March 10, 1987, Balzer filed suit in state court and obtained a temporary protective order (the "TPO") which it served on the Debtor on the following day. The TPO prohibited the Debtor from transferring, among other things, funds in its bank accounts and its accounts receivable. Under state law, service of the TPO on the Debtor created a lien on the Debtor's bank accounts and accounts receivable. On April 1, 1987, a writ of attachment (the "Writ") was issued by the state court covering the same property covered by the TPO. The Writ was levied on the Debtor's bank account at Bank of America and on an account receivable allegedly owed by Mervyn's—an account debtor of the Debtor—on April 2, 1987.

At the time the Writ was levied, the balance in the Debtor's bank account was in excess of $40,200.49. These funds came from a check in the amount of $40,762.58 issued by Mervyn's on March 27, 1987 and posted to the Debtor's account on April 1, 1987. This check was issued in payment of the Debtor's invoice No. 2793 dated March 23, 1987 in the amount of $39,591.08 (the "Invoice"). (The difference between the amount of the Invoice and the amount of the check appears to relate to shipping charges.)

The goods invoiced in the Invoice were ordered by Mervyn's in January 1987 pursuant to Purchase Order No. 760890 (the "Purchase Order"). There are some discrepancies between the Invoice and the Purchase Order. For example, the Purchase Order requests delivery by March 16; the Invoice date indicates that delivery was not made until March 23. The Purchase Order is in the total amount of $40,948.40 (not including shipping charges); the Invoice amount is for only $39,592.08. Both the Purchase Order and the Invoice specify 1,432 17″ × 20″ Junior Photographic Posters. However, the scenes to be depicted on

those posters and the quantity of each type differs somewhat between the two documents.

On April 6, 1987, Balzer and the Debtor entered into a settlement agreement. Balzer agreed to accept $34,000 in full settlement of its claims. In accordance with a letter of instruction sent to the Debtor by Balzer's counsel, Balzer delivered documents to the Sheriff authorizing release of the levy. On April 9, 1987, the Debtor picked up the release documents from the Sheriff and presented them to the bank. The Debtor then purchased a cashier's check payable to Balzer in the amount of $34,000 and delivered the check to Balzer's agent, who met the Debtor at the bank.

On June 30, 1987, the Debtor filed a voluntary petition seeking relief under chapter 7 of the Bankruptcy Code. Thus, the preference period under 11 U.S.C. section 547 began on April 1, 1987, one day prior to the date of the levy of the Writ. The parties agree that, had Balzer not received the settlement check and were found to be a general, unsecured creditor in this chapter 7 case, its share in the distribution of assets from the estate would be less than $34,000.

## DISCUSSION

### A. ELEMENTS OF A PREFERENCE

Section 547(b) of the Bankruptcy Code provides that:

... the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; ...

. . . . .

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

To prevail in a preference action, the Trustee must establish each of the elements specified in 11 U.S.C. section 547(b). In the instant action, given the stipulated facts, the Trustee can easily satisfy this burden with respect to all but the last element: i.e., that the creditor received more than it would have received in a chapter 7 case if it had not received the transfer. The Trustee asserts two arguments as to why Balzer would have been treated as a general, unsecured creditor in this case had it not received the settlement check: (1) that the mechanics of the settlement rendered Balzer unsecured before it received the check; and (2) that the lien created by the TPO did not attach to the Mervyn's account receivable: (a) because the funds deposited in the Debtor's bank account on April 1, 1987 came from a different account receivable; and (b) because the account receivable had not been performed when the TPO was served and because the lien of a temporary protective order or writ of attachment does not attach to an account receivable until it is performed. We address each of these arguments in turn.

### B. DID THE MECHANICS OF THE SETTLEMENT RENDER BALZER'S CLAIM UNSECURED PRIOR TO RECEIPT OF THE SETTLEMENT CHECK?

The mechanics of the settlement, as reflected in Balzer's letter of instructions, indicate that Balzer's release documents were delivered to the bank just before the settlement check was issued (presumably freeing up funds for this purpose). The Trustee contends that this rendered Balzer unsecured for a moment prior to its receipt of the funds and that this moment is sufficient for purposes of 11 U.S.C. section 547(b)(5). This argument has a theoretical appeal but ignores the realities of the transaction. The letter of instructions makes it clear that the release of the levy

was conditional on the settlement payment. Balzer's agent was present at the Bank to protect its interests. Had the Debtor attempted to renege on the agreement and Balzer's agent had protested, it is extremely unlikely that the bank would have released the funds to the Debtor. Thus, if Balzer's agent had not received the settlement check, the attachment lien would have remained in place. Thus, we must address the Trustee's arguments as to why this attachment lien could have been invalidated as to the funds in the Debtor's bank account on April 2, 1987.

### C. WAS THE ATTACHMENT LIEN AVOIDABLE AS A PREFERENCE?

The Writ was levied on the Debtor's bank account during the preference period. Thus, if forced to stand on its own, the lien created by the levy of the Writ could clearly have been avoided as a preference. However, the lien created by levy of a writ of attachment relates back to the creation of a lien by service of a temporary protective order assuming the same property is covered by each. Cal.Civ.Pro.Code section 488.500(e); *In re Wind Power Systems*, 841 F.2d 288 (9th Cir.1988). Therefore, if the funds in the Debtor's bank account on April 2, 1987, when the Writ was levied, were the proceeds of the Mervyn's account receivable and if the service of the TPO created a lien on the Mervyn's account receivable, Balzer's attachment lien on the funds in the Debtor's bank account on April 2, 1987 could not have been avoided as a preference. As stated above, the Trustee contends: (1) that the funds in the account were not the proceeds of the account receivable subjected to a lien by service of the TPO and (2) that, because the account receivable had not yet been performed by the Debtor when the TPO was served, the lien did not attach to it. Neither of these arguments is persuasive.

(1) Were the Funds in the Debtor's Bank Account Proceeds of the Account Receivable Attached by Service of the TPO?

■ The law is clear that service of a temporary protective order creates a lien only on property owned by a debtor when it is served and does not impose a continuing lien on subsequently-acquired assets, for example, like a security agreement with an after-acquired property clause. Balzer argues that as long as the temporary protective order describes a category of assets— e.g., accounts receivable—it creates a lien on any accounts receivable that come into existence while it is in force. This theory seems contrary to the plain language of the statute which speaks in terms of property, not categories of property. Cal.Civ.Pro. Code sections 486.110(a); 488.500(e).

The only authority Balzer cites is *In re Wind Power Systems, Inc., supra*, which does not appear to support its position. In *Wind Power*, the court assumes that the property covered by the writ of attachment is identical to the property covered by the temporary protective order. There does not appear to have been any argument to the contrary. Therefore, if the Trustee is correct that the funds in the Debtor's bank account on April 2, 1987 were the proceeds of an account receivable created after service of the TPO, the attachment lien must stand on its own and would be avoidable as a preference, having been levied during the preference period.

■ The Trustee's argument that the funds in the Debtor's bank account on April 2, 1987 came from a different account receivable is based on the several variances between the Purchase Order and the Invoice discussed in the summary of facts above. None of these variances seem sufficient to justify calling the transaction covered by the Invoice a different one than that covered by the Purchase Order.

First, the Purchase Order contained a requested delivery date of March 16. The Invoice indicates that the actual delivery date was March 23. The terms and conditions on the reverse side of the Purchase Order indicate merely that, if delivery is not timely, Mervyn's may cancel the order. In fact, Mervyn's chose not to cancel the order and accepted delivery of the goods on March 23. Second, the Invoice bears a

**436**

price approximately $1400 less than the Purchase Order. This variance also seems permitted by the terms and conditions of the Purchase Order, which state that the price will be the lower of the last quoted price or the prevailing market price. The other variances relate to the quantity of posters ordered within various subcategories. These variances can fairly be described as inconsequential. Neither the nature of the goods ordered—posters—nor the total quantity of posters was altered. In sum, the Trustee's position appears without merit.

    (2) Did the Lien Created By Service of the TPO Attach to the Mervyn's Account Receivable?

■ The Trustee's principal argument is that neither an attachment lien nor a temporary protective order lien attaches to an account receivable until it is owed and that an account receivable is not owed until it is performed. The only authorities she cites for this position are Cal.Civ.Pro.Code section 488.470(b) and Section 245 of 14 Cal. Jur.3d (Contracts). Neither of these authorities is on point.

Section 488.470(b), which describes the method of levy of a writ of attachment on an account receivable, does use the word "owed". However, that subsection deals with service of accounts that have been assigned to a third person. The debt referred to by the word "owed" is the debt of the third person to the defendant, not the debt of the account debtor to the defendant. The citation to Cal.Jur.3d is equally inapplicable. The discussion cited simply states that, until a contract is performed, the debt cannot be collected; it does not state that the debt is not owed until performance is completed.

The attachment law itself, on its face, seems unambiguously to permit attachment of an account receivable before it is performed. Section 486.110 of the California Code of Civil Procedure indicates that service of a temporary protective order creates a lien on any property of the defendant described in the order which is subject to attachment. Section 487.010(a) indicates that all property of a corporate defendant

for which a method of levy is provided is subject to attachment. Section 488.470 provides a method of levy for accounts receivable. Section 481.030 defines accounts receivable, by reference to Section 9106 of the California Commercial Code, as any right to payment for goods or services, whether or not earned by performance. (Conveniently, the same definition of accounts receivable is contained in the preference statute; 11 U.S.C. section 547(a)(3).)

Nevertheless, the Trustee's argument cannot be summarily rejected. Although not cited by either party, there does seem to be some authority to support her position, both under California law and federal bankruptcy law. As stated in *Javorek v. Superior Court of Monterey County,* 17 Cal.3d 629, 640, 131 Cal.Rptr. 768, 777, 552 P.2d 728 (1976):

> While earlier cases required that the defendant have an accrued cause of action against the garnishee—that the debt be due at the time the writ is levied—such is no longer the law. (Id. at p. 1617.) "[I]t is now established in this state that a present right of action upon the obligation is not essential to a valid garnishment," (*Brunskill v. Stutman,* (1960) 186 Cal.App.2d 97, 104, 8 Cal.Rptr. 910, 915) but a " 'debt which is uncertain and contingent in the sense that it may never become due and payable, is not subject to garnishment.' " (Id.; see also *Hustead v. Superior Court,* (1969) 2 Cal.App.3d 780, 786, 83 Cal.Rptr. 26, 29; *Dawson v. Bank of America* (1950) 100 Cal.App.2d 305, 309, 223 P.2d 280.) A distinction exists between situations where only the *amount* of liability is uncertain and those where the fact of *liability* is uncertain. " 'Where there is no contingency as to the garnishee's liability, the only contingency being as to the amount thereof, and where the amount of the liability is capable of definite ascertainment in the future, there is no such contingency as prevents garnishment of the claim, even though, it has been held, it may be that eventually it will be found that nothing is due.' " (*Brunskill v. Stutman, supra,* 186 Cal.App.2d 97, 105, 8 Cal.Rptr. 910, 916, see also *Hustead v.*

*Superior Court, supra,* 2 Cal.App.3d 780, 786, 83 Cal.Rptr. 26; *Meacham v. Meacham* (1968) 262 Cal.App.2d 248, 252, 68 Cal.Rptr. 746.)

The difficulty in applying the rule stated in *Javorek, supra,* to the instant case is determining whether a debt before it is performed is contingent as to liability or only as to amount. The cases cited by *Javorek, supra,* and others reviewed by this court do not resolve this question. Those most closely on point are *Brunskill v. Stutman,* 186 Cal.App.2d 97, 8 Cal.Rptr. 910 (1960) and *Axe v. Commercial Credit Corp.,* 227 Cal.App.2d 216, 222, 38 Cal. Rptr. 558 (1964). *Brunskill, supra,* involved the attachment of proceeds from a construction contract for the Navy which had been substantially but not completely performed at the time of the levy. *Axe, supra,* involved a levy on accounts assigned to a third party, at a time when it was unclear that there would be any excess of accounts collected by the third party over the debt owed by the debtor to the third party. In both cases, the levy was upheld. However, in *Axe, supra,* it is not revealed whether the accounts being collected had themselves been performed. In *Brunskill, supra,* at 107 the court specifically notes that:

> This is not a case presenting the question of attachability of an unmatured progress payment under a building contract.... For this reason among others the instant case is clearly distinguishable from *Early v. Town of Redwood City, supra,* 57 Cal. 193, upon which appellant heavily relies.

However, the ambiguity created by these and other cases, most of which predate the enactment of the current attachment law and the Uniform Commercial Code, does not seem sufficient to justify disregarding the plain language of the attachment law itself. Thus, the court finds that, under California law, the lien created by service of the TPO did attach to the Mervyn's account receivable.

■ Because this argument has been raised in a preference action, however, this court must also consider the effect of 11 U.S.C. section 547(e)(3). Section 547(e)(3) states:

> For the purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred.

Arguably, even if an account receivable has been attached under state law prior to the preference period, in a preference action, the transfer might not be deemed to occur until a later date: i.e., when the debtor acquired a right in the account receivable. The question then is, under bankruptcy law, when does a debtor acquire a right in an account receivable under 11 U.S.C. section 547(e)(3).

The court is aware of three cases in which it has been argued, as here, that a debtor does not acquire a right in an account receivable until it is performed: *In re Diversified World Investments, Ltd.,* 12 B.R. 517 (Bkr.Ct.S.D.Tex.1981); *Beck v. International Harvester Credit Corp.,* 29 B.R. 907 (Bkr.Ct.D.Conn.1983) and *In re Long Chevrolet, Inc.,* 79 B.R. 759 (N.D.Ill. 1987). All three cases differ from the instant case in that they involve preference attacks on voluntary payments to secured creditors, not levying creditors.

In *Diversified, supra,* the court interpreted 11 U.S.C. section 547(e)(3) as justifying a finding that the payment was a preference. It reviewed the legislative history of Section 547(e)(3), which was enacted to overrule the holdings of *Dubay v. Williams,* 417 F.2d 1277 (9th Cir.1969) and *Grain Merchants of Indiana, Inc. v. Union Bank and Savings Co.,* 408 F.2d 209 (7th Cir.1969)—cases which had held that the transfer of a security interest in a revolving pool of accounts receivable and inventory occurred when the security interest was perfected rather than when the debtor acquired an interest in a specific account. The court acknowledged that the issue presented by the case before it was a different one. Nevertheless, the court found that it would be most in keeping with Congressional intent to interpret Section 547(e)(3) as requiring that an account receivable be performed before it could be transferred for preference purposes.

The *Beck* case, *supra*, reached the opposite conclusion on identical facts. It discussed and rejected the reasoning used by the *Diversified* court. It noted that, under settled pre-Code law, it was clear that payments made during the preference period pursuant to a contract assigned prior to the preference period could not be recovered as a preference. *See Rockmore v. Lehman*, 128 F.2d 564, rev'd on rehearing 129 F.2d 392 (2d Cir.1942). It concluded that there was "... no basis for construing section 547(e)(3) as affecting settled law beyond its effect on after-acquired property clauses." *Beck, supra*, 29 B.R. 907, 8 C.B.C.2d at 876–77.

The *Diversified* case is criticized by Collier as "... [providing] the trustee with a potent weapon for avoiding legitimate security arrangements, a result not intended by Congress." 4 Collier on Bankruptcy, section 547.16[7], p. 547.67 (15th ed. 1979). The reasoning of the *Diversified* case is also rejected in *In re Long Chevrolet, Inc.*, 79 B.R. 759 (N.D.Ill.1987) on slightly different facts, largely in reliance on the criticism voiced by Collier.

We also find the analysis in *Beck, supra*, sounder than that in *Diversified, supra*. Moreover, we see no reason to distinguish these cases from the instant one simply because the instant case involves an involuntary transfer. As a result, this court concludes that, under bankruptcy law, for purposes of preference analysis, an effective transfer of an interest in the Mervyn's account receivable occurred on March 11, 1987 when the TPO was served. As a result, Balzer had an unavoidable lien on the funds in the bank account on April 9, 1987.

## CONCLUSION

Balzer's motion for summary judgment is granted, and the Trustee's action to recover the $34,000 payment to Balzer is dismissed with prejudice.