

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-21-2004

# Biase v. Congress Fin Corp

Precedential or Non-Precedential: Precedential

Docket No. 02-4177

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Biase v. Congress Fin Corp" (2004). *2004 Decisions*. Paper 544.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/544

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

No.: 02-4177
_____

IN THE MATTER OF:

TOPS APPLIANCE CITY, INC.,

Debtor

DONALD V. BIASE, TRUSTEE IN
BANKRUPTCY FOR TOPS
APPLIANCE
CITY, INC.

v.

CONGRESS FINANCIAL
CORPORATION,

Donald V. Biase,
Appellant

Appeal from the United States District
Court
for the District of New Jersey
(D.C. Civil Action No.02-cv-02890)
Chief District Judge: Honorable John W.
Bissell
_____
Argued on June 16, 2003

(Opinion filed June 21, 2004)

Before: ALITO, ROTH, and HALL* ,
Circuit Judges

Richard B. Honig, Esquire (Argued)
John A. Adler, Esquire
Hellring, Lindeman, Goldstein & Siegal,
LLP
One Gateway Center
Newark, NJ 07102-5386

Counsel for Appellant

Stanley L. Lane, Jr., Esquire (Argued)
Otterbourg, Steindler, Houston & Rosen
230 Park Avenue
New York, NY 10169

William S. Katchen, Esquire
Joseph H. Lemkin, Esquire
Duane Morris, LLP
744 Broad Street
Newark, NJ 07102

Counsel for Appellees

O P I N I O N

ROTH, Circuit Judge:

Donald Biase, trustee in bankruptcy
of Tops Appliance City, Inc., brought suit

_____

*The Hon. Cynthia H. Hall, Circuit
Judge for the United States Court of
Appeals for the Ninth Circuit, sitting by
designation.

1

against Congress Financial Corporation to recover $10.5 million dollars in payments from Tops to Congress. The Bankruptcy Court granted summary judgment in favor of Congress, dismissing the action. The District Court affirmed. On this appeal to us, we are asked to decide two issues: (1) whether the transfer between Tops and Congress was a transfer of Tops' interest in leases, and thus of an interest in real property, subject to the New Jersey Recording Statute, or a transfer of the proceeds of the sales of the leases, and thus secured by the filing of a UCC-1 Financing Statement; and (2) whether the transfer from Tops to Congress occurred within 90 days of the filing of the bankruptcy petition, making it avoidable by the trustee. For the reasons stated by the Bankruptcy Court, we conclude that the transfer was of proceeds and not of an interest in real property. Furthermore, because the transfer of Tops' interest in these proceeds occurred more than ninety days before the bankruptcy petition was filed, the transfer is not a voidable preference under § 547(b) of the Bankruptcy Code.

## I. Factual Background and Procedural History

Congress is engaged in the business of commercial finance and asset-based lending. On October 31, 1996, Congress and Tops, entered into a Loan Security Agreement (LSA) whereby Congress agreed to provide Tops with financing for its business. Section 5.1 of the LSA granted Congress a security interest in "all present and future contract rights [and] general intangibles (including but not limited to . . . existing and future leasehold interests in equipment, real estate, and fixtures)." Additionally, § 9.7 of the LSA required Congress's assent before Tops made any substantial modification to its business plan. More specifically, § 9.7(b)(iii) of the LSA provided that, if Tops sold any of its assets, "any and all net proceeds payable or delivered to [Tops] . . . shall be paid or delivered [to Congress]." Congress filled a UCC-1 Financing Statement in New York and New Jersey to perfect this security interest.

In the fall of 1999, Tops decided to stop selling so-called "brown goods," *i.e.*, home electronics, and to focus entirely on "white goods," *i.e.*, appliances such as dish washers and refrigerators. Pursuant to this plan, Tops sought to sell to Best Buy Stores, L.P., Tops' leases for three of its home electronics retail stores. Tops entered into a Sale-Purchase Agreement (SPA) with Best Buy. The purchase price for the leases was $10 million, plus $500,000 which was added later when the landlord of one of the stores agreed to extend its lease for Best Buy. According to § 2 of the SPA, Best Buy would pay $1 million immediately to the Chicago Title Insurance Company, acting as escrow agent; Best Buy would pay the remainder into escrow at closing. At the October 29 closing, Tops was to convey the three leases to Best Buy and hand over keys for each of the locations. Tops and Best Buy also agreed to enter into a license agreement, which would allow Tops to remain in the leased premises until Tops had liquidated its inventory, but not later than December 31, 1999. The SPA

2

provided for 20 percent of the purchase price to be paid to Tops at closing and the remainder to be paid from escrow when Tops delivered possession of all leased premises to Best Buy.

Because the sale of the leases would involve a material change in its strategic business plan, Tops notified Congress of its intent and asked for Congress's consent in accordance with the LSA. On October 29, 1999, Tops and Congress executed both Amendment 6 to the LSA and a contract, entitled the Collateral Assignment of Acquisition Agreement (CAAA), by which Congress gave its approval for the sale of the leases provided that the proceeds, received from Best Buy, would immediately be transferred to Congress. $2.1 million of the escrowed amount would be paid to Congress at closing to reduce Tops' outstanding loan balance, subject to relending. The remaining $8.4 million would be paid from escrow by December 31, 1999, when Tops had vacated the three stores. Amendment 6 also contained a reduction by up to $2 million of the total amount of transaction proceeds available for relending to Tops. In addition, Amendment 6 continued all Congress's security interests under the LSA. These terms were carried out as agreed, with the exception that the initial $2.1 million payment, due at closing, was actually paid three days later on November 3. The remainder of the escrowed proceeds were paid to Congress on December 7, 1999, when Tops vacated the stores.

On February 2, 2000, Tops filed a Chapter 11 petition in bankruptcy. This was converted to Chapter 7 on April 16. The appellant, Donald Biase, was appointed Chapter 7 Trustee. He filed a complaint on June 26, 2000, seeking to avoid the $10.5 million that had been paid to Congress. Cross motions for summary judgment were filed. On May 1, 2002, the Bankruptcy Court granted summary judgment in favor of Congress, finding that the payment of the $10.5 million proceeds to Congress was pursuant to a perfected assignment of proceeds of the sale of leaseholds and that transfer of the proceeds dated from October 29, 1999, when Congress obtained the right to receive them. Biase appealed this decision to the District Court which affirmed the judgment of the Bankruptcy Court on October 30, 2002. Biase appealed to this Court.

## II. Jurisdiction and Standards of Review

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. §1334(b) and 28 U.S.C. §157(a). We have jurisdiction to consider Biase's appeal of the District Court's final order under 28 U.S.C. §1291.

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Chisolm v. McManimon, 275 F.3d 315, 321 (3d Cir. 2001) (quoting Fed. R. Civ. P. 56(c)). In reviewing a summary judgment decision of the Bankruptcy Court, we apply, as did the District Court, a plenary

standard to legal issues. See In re Siciliano, 13 F.3d 748, 750 (3d Cir. 1994); Saldana v. Kmart Corp., 260 F.3d 228, 231 (3d Cir. 2001).

### III. Discussion

### A. Perfection of the Proceeds from Tops' Leases

This case turns upon the nature of the transactions both between Congress and Tops and between Tops and Best Buy. Biase argues that what was transferred to Congress was an interest in the leases and their rents, and not the proceeds of the sale of the leases by Tops to Best Buy. An interest in a lease is an interest in real property and would have to be perfected through the New Jersey Recording Statute. N.J. Stat. Ann. § 46:16-1 (West 2003). To make his point that this transaction was the transfer of an interest in real property, Biase highlights the fact that Tops did not vacate the stores until December 1999, remaining in the stores under a license agreement with Best Buy. However, despite Biase's attempts to characterize the transaction between Congress and Tops as a real estate transaction, the evidence of record demonstrates that the leases were completely transferred by Tops to Best Buy as of the date of the closing on October 29, 1999, and that Congress was granted an interest only in the proceeds from that transfer.

Congress never had any property right in the leases themselves because, as of October 29, 1999, they were wholly owned by Best Buy. The SPA between Tops and Best Buy clearly stated that Tops was to convey "all of Seller's right, title and interest in . . . the Leases," including easements, fixtures, and all land rights. This was an absolute assignment of Tops' property rights. The transfer was not incomplete just because Tops had another duty to perform under the SPA, *i.e.*, vacating the premises at each leased location by December 31. See First Fid. Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.), 59 F.3d 423, 428 (3d Cir. 1995) ("The fact that a right is conditional on the performance of a return promise or is otherwise conditional does not prevent its assignment before the condition occurs."). On the October 29 closing date, all keys, blue prints, and financial documents were turned over to Best Buy. Tops remained in the stores to liquidate its inventory, but it did so as a licensee with limited rights under §12(l) of the SPA: "This Agreement is an exclusive, revocable license . . . and shall not be deemed as . . . conveying any interest in the Licensed Area (other than as set forth herein)." Tops did not hold any remaining property interest in the leases, and thus could not have granted Congress what it did not have itself.

While Biase is correct in pointing out that courts will not be restricted by the exact words used by the parties in characterizing a transaction, see, e.g., Major's Furniture Mart, Inc. v. Castle Credit Corp., 602 F.2d 538, 545 (3d Cir. 1979), a court should start with the words themselves and begin with the plain meaning of the document. See Watt v. Alaska, 451 U.S. 259, 266 n.9 (1981) (noting that while the plain-meaning rule is not absolute, "the words used, even in their literal sense, are the primary, and

4

ordinarily most reliable, source of interpreting the measure of any writing: be it a statute, a contract, or anything else") (quoting Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.) (L. Hand, J.), aff'd, 326 U.S. 404 (1945)). The plain words both in the SPA and in the CAAA are unambiguous. There is nothing in the record to indicate that Tops conveyed to Congress anything more than the proceeds of the transfer of the leases to Best Buy. There is no doubt that, as of the date of the closing, Best Buy had sole control of the three leases in question. Thus, Tops could grant Congress only what remained: a simple contract right to the proceeds from the sale of those leases.

As both parties acknowledge, the acquisition of such a right to proceeds falls under Article 9 of the Uniform Commercial Code. See N.J. Stat. Ann. 12A:9-109 (West 2003) (explaining that the scope of Article 9 extends to all accounts); N.J. Stat. Ann. 12A:9-102(2) (West 2003) (defining "account" in part as "a right to payment of a monetary obligation, whether or not earned by performance [] for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of"). This secured interest in proceeds was properly perfected when Congress filed their UCC-1 Financing Statement.

Contrary to Biase's contention, this result does nothing to detract from the effectiveness of the New Jersey Recording Statute. The purpose of the New Jersey Recording Statute is to "protect subsequent judgment creditors, bona fide purchasers, and bona fide mortgagees against the assertion of prior claims to the land based upon any recordable but unrecorded instrument." Cox v. RKA Corp, 164 N.J. 487 (2000); see also Cooper River Plaza E, LLC v. Briad Group, 359 N.J. Super. 518, 527-28 (N.J. Super. Ct. App. Div. 2003) (noting that the central public policy under the New Jersey Recording Act is so that a potential buyer of real property "should be able to discover and evaluate all of the . . . restrictions on the property from a review of the public record") (citations omitted). The fact that Congress had a right to proceeds from the leases did nothing to tie up the leased real property in any manner. Congress had no interest in the underlying real property itself and could not have made any claims on the real property against a subsequent purchaser – whether or not Tops made the required payments to Congress under the CAAA.

## B. Avoidability of the Transfer of the Proceeds

Having established that Congress's interest was in proceeds, which fall under Article 9 and are thus perfected with the filing of the UCC-1 Financing Statement, we turn to Biase's second argument that the transfer of money from Tops to Congress did not occur on October 29, 1999, the date of the closing, but actually occurred on December 7, 1999, when Tops had vacated all three stores pursuant to the contract with Best Buy. The bankruptcy petition was filed on February 2, 2000. If the transfer had occurred on December 7, 1999, the transfer would fall within the 90 day preference period of 11 U.S.C. §

5

547(b),[1] and thus would be avoidable by the trustee.

Biase urges us to adopt the reasoning used in wage assignment cases. Under the line of cases which Biase cites, courts have held that employees do not "receive" their money when a garnishment order takes effect. The employees only receive their money when they have earned it by working the corresponding hours. See, e.g., Morehead v. State Farm Mut. Auto. Ins. Co. (In re Morehead), 249 F.3d 445, 449 (6th Cir. 2001); Freedom Group, Inc. v. Lapham-Hickey Steel Corp. (In re Freedom Group), 50 F.3d 408, 412 (7th Cir. 1995); Melon Produce, Inc. v. Karger (In re Melon Produce, Inc.), 976 F.2d 71, 76 (1st Cir. 1992); In re White, 258 B.R. 129 (Bankr. D.N.J. 2001); In re

---

[1] Section 547(b) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property –
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made –
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if –
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

6

Mays, 256 B.R. 555 (Bankr. D.N.J. 2000). Thus, Biase analogizes that Congress, like a wage garnisher, did not "receive" its money on the closing date when its security interest attached, but only when Tops had vacated its stores and "earned it" under the SPA with Best Buy.

In wage garnishment cases, however, a transfer of future wages could not take place at the time the garnishment is ordered because the employee can transfer only that in which he has some right. Until the employee has performed the work to earn the wages and has a right to the money, there is no transfer within the meaning of § 547(e). See Morehead, 249 F.3d at 449 ("It is illogical to find that a debtor may acquire rights in future wages when they have not yet been earned."); Melon Produce, Inc., 976 F.2d at 76 ("[A] transfer is not made until the debtor has acquired rights in the property transferred.") (citation omitted). Biase is correct that under the SPA, Tops had not completed all of its duties under the contract and was still required to vacate the three stores by the end of December. However, unlike the wage garnishment cases, vacating the three stores was only a condition attached to a much larger transaction between Tops and Best Buy. Unlike a wage case, where an employee will not get paid if he does not work the corresponding hours, Best Buy's remedy, if Tops had not vacated the stores by December 31, would have been the eviction of Tops from the premises and a suit for damages. Once Tops had sold its leases and turned over the keys, blue prints, and financial documents to Best Buy, Tops had, for all intents and purposes, "earned its money" regardless of the fact that, under the SPA, it still had the duty to vacate.

This conclusion regarding the effective date of the transfer of proceeds is supported by New Jersey law. As the U.S. Supreme Court noted in Barnhill v. Johnson, 503 U.S. 393 (1992), when a transfer is complete and what constitutes a transfer is a matter of federal law,[2] but defining the specific interest in property is a "creature[] of state law." Id. at 398. Congress 's UCC-1 Financing Statement applied to "all present and future contract rights." Thus, pursuant to N.J. Stat. Ann. 12A:9-201(a) ("[A] security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors"); and N.J. Stat. Ann. 12A:9-204(a) ("[A] security agreement may create or provide for a security interest in after-acquired

---

[2]It should be noted that there is no doubt that the term transfer includes the granting of a security interest. See 11 U.S.C. §101(54) (West 2003) (defining transfer broadly as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property"); see also, Vogel v. Russell Transfer, Inc., 852 F.2d 797, 798 (4th Cir. 1988) ("The grant of a security interest is a transfer within the definition of [the preference avoidance statute] and the trustee may avoid it if it is not perfected in time.")

collateral."), Congress properly perfected its rights to proceeds and had an interest superior to that of any subsequent creditor.

The Bankruptcy Court properly relied on In re Long Chevrolet, Inc., 79 B.R. 759 (N.D. Ill. 1987), which concerned the refund of an excess contribution to a pension plan. Even though Long Chevrolet had to wait for the Pension Benefit Guaranty Corporation to approve the allocation and distribution of funds upon the termination of the plan, the court found that there was a transfer at the time Long Chevrolet first granted the security interest in the refund. As explained by the District Court in that case, just because Long "had to wait for those funds to be distributed does not mean it had no right to that property prior to that time." Long Chevrolet, 79 B.R. at 765. See also In re Computer Eng'g Assocs., 337 F.3d 38, 45-47 (1st Cir. 2003) (holding that the transfer of all rights, interests, and control in property assigned was an effective assignment occurring at the time the assignment was perfected, not later when proceeds paid). As § 547(e)(1)(B) of the Bankruptcy Code provides: "A transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." 11 U.S.C. § 547(e)(1)(B) (West 2003). We therefore find that the transfer of the proceeds from the sale of the leases occurred on the date of the closing, on October 29, 1999, and therefore fell outside the preference period.

Finally, the fact that Best Buy paid the proceeds into an escrow account does not affect our conclusion above. The right to the funds paid into escrow was determined at the time of the closing, both through the LSA and the CAAA. There was no further designation of a right to the funds which was necessary to occur to trigger their payment. The trigger of payment was a matter of timing, not a matter of a further determination of interests.

## IV. Conclusion

For the reasons stated, above we will affirm the judgment of the District Court, affirming the Bankruptcy Court's granting of Congress's motion for summary judgment.

8