In re NORTHWEST ELECTRIC
COMPANY OF OHIO, Debtor.

NORTHWEST ELECTRIC COMPANY
OF OHIO, Plaintiff,

v.

A.P. O'HORO COMPANY,
Defendant (Two Cases).

NORTHWEST ELECTRIC COMPANY
OF OHIO, Plaintiff,

v.

OHIO EDISON COMPANY, Defendant.

Bankruptcy No. 86–00595E.
Adv. Nos. 87–0005, 87–0014 and 87–0024.

United States Bankruptcy Court,
W.D. Pennsylvania.

March 28, 1988.

Lawrence C. Bolla, Erie, Pa., for debtor.

George J. Limbert, Youngstown, Ohio, for A.P. O'Horo Co.

Robert S. McGeough, Warren, Ohio, for Ohio Edison Co.

OPINION

WARREN W. BENTZ, Bankruptcy Judge.

*Issue*

The issue is the date of transfer in this preference action brought under § 547 of the Bankruptcy Code.

*Facts*

These three cases have a common factual background and a common issue and will therefore be discussed together. The plaintiff-debtor, Northwest Electric Company of Ohio ("Northwest"), was the electrical contractor on the Trumbull County, Ohio, Mosquito Creek Waste Water Treatment Plant. Trumbull County was the owner. All payments for work performed came from the Ohio Water Development Authority ("Authority"), a quasi-governmental agency formed by the State of Ohio to fund local waste water projects. Defendants, Ohio Edison Company ("Edison") and A.P. O'Horo Company ("O'Horo") were subcontractors under Northwest on the project.

Northwest became delinquent in its payments to both subcontractors and on May 19, 1986, Northwest executed an assignment in favor of Edison and on July 15, 1986, Northwest executed an assignment in favor of O'Horo. Northwest's assignment to Edison purported to assign to Edison Northwest's claim against Trumbull County for payment for future work to be performed by Northwest up to the $115,000 then owed by Northwest to Edison. The assignment to O'Horo contained similar terms, the amount owed to O'Horo being $54,765. Trumbull County and the Authority both were notified of the assignments and accepted same. Thus, both Edison and O'Horo considered themselves to be secured in that they would receive, up to the amounts owed them, future payments for future work performed by Northwest on the project.

Each assignment was an assignment of the entire account, but provided that it shall become null and void upon full payment of amounts due to O'Horo or Edison, respectively.

On December 5, 1986, Northwest filed its Chapter 11 proceeding.

On account of work performed by Northwest on the Mosquito Creek Project during late September and the months of October and November, 1986, the Authority made the following payments pursuant to the assignments:

November 5, 1986 – $24,986.81 to Edison
November 5, 1986 – $ 4,240.55 to O'Horo
December 17, 1986 – $ 5,922.96 to O'Horo

(Other payments were made earlier, but were for work performed outside the preference period and were not attacked by the debtor.)

The debtor brought the within adversary proceedings to recover the above payments, asserting that they are preferences under § 547 of the Bankruptcy Code. The debtor also asserts that the December 17, 1986 payment to O'Horo, having been made after the filing of the Chapter 11 petition, is recoverable under § 549.

*Discussion*

Northwest makes four arguments:

(1) Edison does not have a mechanic's lien on the fund from which it was paid, because it did not file a sworn and itemized statement in accordance with the Ohio Mechanic's Lien Law, and the Mechanic's Lien Law is the exclusive method by which Edison could obtain a lien.

(2) Edison is not a secured creditor under the Ohio Uniform Commercial Code, because it failed to file financing statements with the appropriate public offices.

(3) The transfer did not take place on May 19, 1986 (the date of the assignment to Edison) or July 15, 1986 (the date of the assignment to O'Horo) because Northwest had not yet acquired the right to payment of the proceeds assigned because its contractual obligations prerequisite to such payments had not yet been completed; and that the transfer in fact took place on the date of payment, i.e., November 5, 1986 and December 17, 1986.

(4) Alternatively, the date or dates of transfer were the dates upon which Northwest earned the right to payment under its contract with Trumbull County.

The defendants, Edison and O'Horo, argue that upon the execution of the assignments, the property covered thereby, and the money ultimately transferred, was no longer property of the debtor; that as of the date of the execution of the assignments, the title to the property which

Northwest seeks was irrevocably transferred, never became property of the debtor, and the money paid is not recoverable under § 547. Further, the assignments were executed four and one-half months and six and one-half months prior to the bankruptcy, well outside the 90 day preference period. Also, each assignment, well prior to the 90 day preference period, was, in fact, a transfer of complete ownership, stripping Northwest of all interest in and right to payments under the assignment agreement.

Edison also argues that it gave further consideration for the assignment, in that the assignment was given "to induce Ohio Edison to energize the project" and that such language was a part of the assignment.

O'Horo also argues that by signing the assignment agreement, Northwest was discharged of its obligation to O'Horo.

Defendants also argue that even if the assignment agreement was not a complete assignment of ownership, and was only a security interest, it was nevertheless perfected without the filing of a financing statement pursuant to Ohio Revised Code § 1309.21(A)(5) [UCC 9–302(1)(e) ] since the assignment to each subcontractor was not a "significant part of the outstanding accounts of the assignor" as provided in the UCC.

▆ Nothing persuasive is shown to us to indicate that the Ohio Mechanic's Lien Law is the exclusive method of obtaining a lien or a prior right to a particular fund. Hence, the argument of Northwest that these subcontractors may establish their claims only under the Ohio Mechanic's Lien Law, and not otherwise, is not determinative.

▆ Edison's argument that the assignment was given as consideration to induce Edison to energize the project is also without merit. Even if we were to assume the assignment was given as consideration, although we express our reservations in light of the pre-existing duty rule, the consideration was a promise to energize the project and was given at the time the assignment was executed. Thus, no new value was exchanged when the transfer occurred during the preference period. In light of the foregoing, we fail to see the relevance of this argument other than an attempt to bring the transfer within an exception listed in § 547(c).

▆ The contention of the defendants that they became the outright owners of the account is also disregarded since the plain terms of the assignment agreements state that the assignments are only valid to the extent of the claim of the subcontractor against Northwest even though both assignments are otherwise blanket assignments of the entire claim of Northwest against the owner. It is quite clear and we find that the assignments were for security purposes.

The court will not determine whether the security interests were perfected without the filing of financing statements on these facts. The O'Horo assignment and certain interrogatories indicate that the owner was indebted to Northwest in the amount of $169,114.05 as of July 15, 1986. However, the May 19, 1986 assignment to Edison indicated the balance due to be $140,000. These figures seem to be somewhat inconsistent, since the figure is the unearned and unpaid portion of the Northwest contract and presumably it would have diminished from the May 19th date to the July 15th date. Out of the unearned contract amount, whichever figure it was, the sum of $54,000 assigned to O'Horo could be a "significant part of the outstanding accounts of the assignor," especially when coupled with the previous assignment to Edison to secure an unpaid balance of $115,000. We need not decide this issue and will assume that the assignment agreements were security interests which were perfected without filing. This is because the crucial question is the date of the "transfer" under § 547. That key issue will be discussed below.

▆ This is analogous to an attachment question under Article 9 of the Uniform Commercial Code. Even if we assume the assignment was perfected, we must decide when this presumed perfected assignment

"attached" to the debtor's right to receive payments for future performance. Under Article 9, attachment does not occur until the debtor acquires rights in the collateral. *See* UCC 9–203(1)(c). Once the debtor acquires rights in the collateral, attachment will relate back to the date of the original agreement. However, the Bankruptcy Code displaces this concept. Under § 547(e)(3), the transfer or "attachment" will not relate back to the date of the original agreement. Rather, for purposes of avoiding preferential transfers, the transfer is deemed to occur only after the debtor has acquired rights in the collateral.

It is the finding of this court that the payments mentioned above are preferences voidable under § 547 of the Bankruptcy Code because the date of the transfer in each case is the date, or dates, upon which Northwest earned the right to payment. Northwest could not transfer what it did not possess. It did possess a contract under which it had the right to perform work; upon day by day performance of the work, Northwest acquired the right to payment for such work. It did not have the right to receive the payment until it put into the job the additional labor and materials that were necessarily additional for contract completion.

In the instant case, if Northwest's right to payment was in existence at the time of the assignment, or at any time prior to 90 days before December 5, 1986, then these defendants would have had liens thereupon which would be unavoidable by the debtor or by a trustee. If the liens of these creditors had been affixed upon any other thing in existence prior to 90 days before December 5, 1986, such liens would have been unavoidable, and any payments subsequently received thereupon would be unavoidable. Such was not the case here.

Application of the preference concept is further exemplified by considering the source of the labor and materials used by Northwest to put into the project in order to generate the right to receive the monies paid to the defendants. Northwest took other assets which it had, or had access to, and put those assets into the project in order to generate the right to receive payment from the project owner. The assets put into the project came from the pool of assets to which other creditors should have access. Those other assets were not drawn from the debtor prior to the 90 days before December 5, 1986; those other assets were drawn from the debtor's assets within 90 days before the bankruptcy. That is fundamental to the preference concept—the diminution of the estate within 90 days before the bankruptcy, in order to pay a particular creditor ahead of other creditors.

§ 547(e)(3) provides:

"(3) For the purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred."

This broad language brings in certain types of transfers made by a debtor within the preference period. The legislative history recognizes that after-acquired property clauses in security agreements effect transfers of property of the debtor to the creditor at the point in time at which the property is acquired by the debtor. Similarly, our interpretation of § 547(e)(3) brings assignments within the result intended by Congress. Collier appears to support this interpretation. 4 *Collier on Bankr.* (MB) ¶ 547.16[1] & [7] (15th Ed. 1987).

The courts, however, have not been uniform in their reasoning nor in their results.

The court in *Beck v. International Harvester Credit Corp. (In re E.P. Hayes, Inc.),* 29 B.R. 907 (Bankr.D.Conn.1983) concludes that § 547(e)(3) was only intended by Congress to apply to security interests on accounts receivable. The court also stated that § 547(e)(3) did not change the existing pre-Bankruptcy Code law in the Second Circuit, laid down by the Honorable Augustus Hand for a unanimous court, and concluded that the date of the execution of an *assignment* governs the imposition of the lien on any sums due. *Id.* at 911. This interpretation would effectively render § 547(e)(3) meaningless, and is inconsistent with our conclusion that an "assignment" of an account to secure a debt is a security agreement.

In *Hayes,* the debtor operated a bus service for a school district under a Pupil Transportation Contract. The secured creditor has a lien on the busses and an assignment of the monthly payments being made by the school district to the debtor under the bussing contract. The assignment was executed some two years prior to the bankruptcy; the trustee sought to recover the payments made by the school district during the preference period. Our view, contrary to the *Hayes* court, is that the debtor had no right to the payments until the bussing service was performed. Had that bussing service operator defaulted in his performance, he could not have collected the contract fee. Hence, under § 547(e)(3), the transfer took place when the bussing service operator performed his daily services.

We think that the problem which may have confused the *Hayes* court was that the busses and the service contract were in existence when the assignment was made two years earlier. But, the key element to be considered in giving effect to the letter and the spirit of the bankruptcy law of preference avoidance is to determine whether the thing assigned, transferred or liened was in existence at the time of the transfer outside of the preference period. In the *Hayes* case, the busses and the service contract were in existence which gives the appearance that the thing assigned was in existence. The problem was that the payments from the school district were not payments alone for the use of the busses but were payments for services which included drivers, mechanics, gas, oil, maintenance and repair. Under § 547(e)(3), the payments for these additional services could not be transferred unless or until the debtor performed these services. It is only after the services are performed that the debtor will have acquired the right to receive payment for the services. Note also that the cost of drivers, mechanics, gas, oil, maintenance and repair during the preference period was a diminution of the estate, so that giving effect to the prior assignment furthered the precise evil which the preference concept was intended to remedy.

*Shaw Industries, Inc. v. Gill (In re Flooring Concepts, Inc.),* 37 B.R. 957 (Bankr. 9th Cir.1984) also supports the validity of the assignments. There, the debtor was a carpeting subcontractor who, outside the preference period, assigned to the carpet supplier the carpeting subcontractor's right to receive future payments on the job. We think the bankruptcy court properly held that approximately $8,000 paid to the carpet supplier for subsequently-supplied carpets was not preferential since the carpet supplier was providing new value for new payment and hence, there was no diminution of the bankrupt's estate and the payment was not a preference. The court also held that the remainder of the payments under the assignments were preferences, but, on appeal, those remaining payments were held not to be preferences on the basis that the right to the payments was subject to an assignment which was executed prior to the preference period. We think the appellate panel was in error in this regard. The subsequent performance by the debtor in laying the carpet and earning the right to payment under the contract was the final element giving rise to his right to payment and therefore, the transfer occurred within the preference period. The thing being assigned, i.e., the right to payment, was not in existence at the time of the assignment. The carpet subcontractor, by installing the carpet within the preference period, used up his own assets, or even obtained new credit from other creditors, in fulfilling the terms of his contract. The subcontractor dissipated his own assets during the preference period in order to accomplish the performance which gave rise to his right to payment from the prime contractor, and if the fruits of that performance are given to pay an antecedent debt (the assignee), then the estate has been diminished during the preference period for the benefit of one creditor over other creditors—the precise result which the preference concept attempts to correct.

*Flooring Concepts* also discusses mechanic's lien policy considerations and seems to be swayed thereby. *Flooring*

*Concepts* points out that the legislature has enunciated a policy of assuring payment to mechanics and material men; that the California law provides for a 20 day notice by a claimant to the owner; and that the material supplier gave such a notice, as a result of which, the assignment was executed. The policy argument is that the material supplier should be protected and that a contrary policy would force material men to always follow the necessary formalities and obtain a material men's lien. We think, however, the analysis falls a step short. The *Flooring Concepts* court would allow the owner, the contractor, the subcontractor, and the material men to get together to provide that future payments to be earned by the subcontractor would be used to pay a particular debt and that the owner and the material men could avoid the filing of a mechanic's lien by such a device. We think that by such a device, those parties have gotten together to arrange a method of disposition of assets so that other creditors of the subcontractor will be prejudiced; not only will other existing creditors of the debtor-subcontractor be unable to share in money due to the subcontractor, they might even supply further credit between the date the assignment is executed and the date the preference period commences, and even during the preference period. Subcontractors who have a right to protect themselves by filing mechanic's lien claims should do so, and not engage in other transactions to evade the mechanic's lien filing requirements which may prejudice other creditors. The party best able to protect himself is the owner, who can control all of the funds being disbursed on the job, and if he fails to initially control such monies to assure that they go to the persons who contribute to the job, he should not be in a position to cause others to suffer the loss which ought to be his. The policy considerations underlying the concept of the preference avoidance should be paramount.

The defendants argue, and *Hayes* and *Flooring Concepts* offer support for, the proposition that an "assignment" of an account effects a change in ownership. Or, as O'Horo argues, it "stripped Northwest of all interest in and right to payments." It is clear, however, that no party, then or now, intended either defendant to collect more under the assignment than the debt due the assignee; no creditor under any of these assignments purchased the absolute right to receive all future payments at the time of the assignment. The assignments were for security purposes; they merely created a lien in the thing (i.e., the debtor's right to receive the payments) as soon as it came into existence. If the debts were satisfied, the creditors would have no right to any of the future payments under the assignment. We have assumed they are valid without the filing of financing statements. How, then, are these assignments different from perfected security agreements under the UCC? They are not different. They operate exactly as security agreements.

Section 547(e)(3) recognizes that assignments for security purposes, like after-acquired property clauses in security agreements, effect a transfer of the debtor's property to the creditor at the time the debtor acquires an interest in the property. The broad language of § 547(e)(3) properly subjects these transfers to preference avoidance. There are limitations to the broad sweep of § 547(e)(3) such as those found in § 547(c)(5). However, couching the lien in terms of an "assignment," instead of a "security interest" does not change the result. These assignments are therefore subject to the same limitations as apply to security interests in accounts receivable under § 547(c)(5)—to wit: a lienor may not improve his position by his lien in accounts receivable generated within the preference period (unless he is protected by one of the exceptions of § 547(c). The ruling in the case at bench must be, and is, consistent with that concept.

An analysis of certain related issues arising under § 547(e)(3) supports a uniform application of our interpretation of this section. In *Efraim Rose, Inc. v. Tavormina (In re Armando Gerstel, Inc.)*, 43 B.R. 925 (Bankr.S.D.Fla.1984), the debtor operated a jewelry store which was robbed. Within days after the robbery, the debtor engaged

an insurance adjuster and an attorney to help him prosecute his claim against his insurance company; the attorney and the adjuster acquired rights in the insurance fund to be collected as a condition of their engagement. The debtor also assigned, outside the preference period, various portions of the claim against the insurance company to other creditors. The court found that all of these assignments were valid. Payment upon the assignments, even though during the preference period, were not preferences. In our view, *Gerstel* is consistent with the view we espouse today. It is consistent for the reason that the res or the thing being assigned was in existence at the time of the assignments. The thing being assigned was a piece or portion of the debtor's claim against its insurance company on account of the robbery. The debtor's claim existed from the moment after the robbery, even though the precise amount of the claim had yet to be determined. The debtor's right to the insurance proceeds was vested (i.e., "earned") at the moment the loss occurred. The assignment in *Gerstel* is fundamentally different from an assignment of the right under a contract to receive payment for future work yet to be performed and earned.

In *Diversified World Investments, Ltd. v. Omni International, Ltd. (In re Diversified World Products, Inc.)*, 12 B.R. 517 (Bankr.S.D.Tex.1981), the court addressed a similar issue arising from the assignment of rental payments on a leased aircraft. There, the debtor assigned to one of its creditors future rental payments due from a third party under a lease. The assignment was executed more than 90 days prior to the bankruptcy. The debtor sought to recover payments made by the lessee to the creditor, pursuant to the assignment, within the preference period. The court found that such payments were transfers, stating that the "rental payments were made when *Diversified* (the debtor) obtained a right to receive them and not at the time of the assignment." *Id.* at 519. The result appears to be consistent with our analysis of § 547(e)(3).

*Collier* appears to disagree with *Diversified,* stating that the debtor had nothing to transfer during the preference period. *See* 4 *Collier on Bankr.* (MB) ¶ 547.16[7] (15th Ed.1987). In *Diversified,* it appears that the debtor gave up nothing, suffered no diminution of his estate during the preference period, unless it was the depreciation accruing. We think assignments of rental payments may present peculiar issues when scrutinized under the law of preferences; that assignments of rental payments must not only be analyzed in terms of whether the contractual right to receive payment (i.e., the lease) was in existence, but also in terms of whether the transfer under the assignment would require the expenditures of other assets of the debtor for the benefit of one creditor over other creditors. If a rental assignment encompasses future lease payments from vacant land, where the owner has no obligation to perform future services in conjunction with the lease, then the debtor may make an assignment of the future rental payments; and if such assignment is perfected, then rental payments during the preference period should not be avoidable. From the assignor's ownership of the land, with no further duty, and the existence of the lease, it follows that the contractual right to receive the future monthly rental payments would already be in existence. Therefore, the transfer would occur at the execution of the assignment and would be unavoidable under § 547 if the assignment occurred prior to the preference period.

Conversely, if the real estate in question were an apartment building, which required elevator service, maintenance, cleaning service, housekeeping service, electric and gas utility supply services, then it may be that the owner's right to payment does not accrue unless and until he performs and provides such services. An assignment, even though outside the preference period, would nevertheless be fundamentally contingent upon future performance by the assignor-owner. Thus, assignments of rental income from real or personal property may raise questions similar to the questions raised in the bus service contract in *Hayes.* 4 *Collier on Bankr.* (MB)

¶ 547.16[7] (15th Ed.1987) discusses this issue and questions the decisions which fail to apply § 547(e)(3) according to its terms. Having no precedent on the subject within this district or circuit, we are free to follow the reasoning of *Collier* and to apply what we consider to be both the spirit and the letter of the preference sections of the Bankruptcy Code.

Therefore, we find that in the instant case, the payments made by the project owner on account of work performed by Northwest within the preference period to Edison and O'Horo are preferences. Payments to O'Horo and Edison by the owner on account of work performed by Northwest prior to the preference period are not preferences, regardless of when such payments were made.

The defendants also argue that the transaction in question as between the parties in Ohio was perfectly valid and the parties were bound by Ohio law to perform pursuant to their agreements. That is, the Trumbull County and the Authority were obligated to make payments directly to Edison and O'Horo. But the whole concept of the preference section is that transfers to a creditor on account of an antecedent debt, while entirely appropriate and legitimate and unavoidable under state law, become recoverable by the debtor's estate for purposes of an equitable division of the debtor's estate among all creditors. Thus, the validity of the transaction under state law may be conceded, but the issue is the equitable recovery and allocation of assets under the Bankruptcy Code. Here, § 547 of the Code is controlling.

O'Horo also argues that the present case is different because the assignment discharged Northwest from any claims that O'Horo may have had against Northwest. We read no such discharge language in the O'Horo assignment. Even if there were such language, it would not change the result. Such language would simply indicate that O'Horo gave up valuable consideration for the assignment, a fact which is not in dispute.

The defendants have argued that they gave up their right to file mechanic's liens in reliance upon the assignments. Their problem is that they had a right to file a lien and secure their payment from the proper source, i.e., the owner. By taking the assignments, they relied upon future diminution of the assets of the debtor in order to perform the future work which would generate the debtor's right to payment from Trumbull County. That diminution impacted on other creditors of Northwest, not only creditors who existed at the time of the assignments, and not only those creditors who extended credit between the dates of the assignments and the commencement of the preference period, but also those creditors who extended credit during the preference period. All those creditors were squeezed out by the attempted assignments.

If O'Horo and Edison had taken an assignment of the debtor's contract in toto, that is, if they had agreed to provide Northwest's performance as well as taking the proceeds from the performance, if they had taken the burdens with the benefits, no one could complain. But here, all the debtor had was a contract with the owner, which permitted the debtor to perform work (i.e., give up labor and material) and be paid for same; we do not even know whether the debtor was to receive as much money for the work as it would cost him to complete the work. We do not know whether there was to be a profit in the work or a loss or how much. It is inappropriate for these two creditors to say that they had rights, based on assignments executed in May and July, to the proceeds of work to be performed by the debtor in September and October, when that performance diminished the debtor's estate and adversely impacted upon other creditors.

Having concluded that the payments earned by the debtor and paid during the preference period may be avoided as preferences, it also follows that the payment earned by the debtor during the preference period, but not paid until after bankruptcy, may also be recovered under § 549.

*Conclusion*

For the reasons set forth above, a separate order will be entered granting judgment in favor of the debtor and against Edison and O'Horo.