USCA1 Opinion

 

 September 29, 1992 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-2250 IN RE: MELON PRODUCE, INC., Debtor, __________ JOSEPH BRAUNSTEIN, TRUSTEE, Plaintiff, Appellee, v. PETER KARGER, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Lay,* Senior Circuit Judge, ____________________ and O'Scannlain,** Circuit Judge. _____________ ____________________ Charles W. Morse, Jr. with whom Alan M. Spiro and Friedman & _______________________ ______________ __________ Atherton were on brief for appellant. ________ John J. Kuzinevich with whom Isaac H. Peres and Riemer & ____________________ ________________ _________ Braunstein were on brief for appellee. __________ ____________________ -1- ____________________ _____________________ * Of the Eighth Circuit, sitting by designation. ** Of the Ninth Circuit, sitting by designation. BREYER, Chief Judge. This appeal raises a ____________ technical question about bankruptcy preferences. Suppose a Creditor has a security agreement that covers "rights to money" and contains an "after-acquired property" clause. Suppose at a later time, within the preference period, the Debtor sells other property to third parties, accepts checks from those parties as payment, and immediately endorses those checks over to the Creditor. Does the Creditor have a perfected security interest in those checks or in the "rights to money" that they represent, thereby permitting the Creditor to receive payments which would otherwise constitute an unlawful "preference?" The district court thought the answer to this question was "no," and it affirmed a bankruptcy court decision that the Creditor had received an unlawful preference. We affirm the district court's judgment. I Background __________ The appellant, Peter Karger, says that, in 1984, he wanted to lend about $600,000 to a company called A. Pellegrino & Sons, then in Chapter 11 bankruptcy proceedings. In order to obtain security for his loan, and with the approval of the bankruptcy court, Karger had -3- 3 Pellegrino transfer two valuable assets -- some leases on bays at the New England Produce Center and some stock in that Center -- to a new corporation (called Melon Produce), which Karger owned. Melon Produce then guaranteed repayment to Karger of the $600,000 loan. And, just to be certain that Melon could pay if necessary, Karger was to obtain a security interest in Melon's assets. If Karger has accurately described what was supposed to happen, then, when the parties drafted the relevant legal documents, something must have gone wrong. The security agreement that Karger executed (with appropriate U.C.C. filings) in August 1984 did not mention Melon's two main assets -- the leases and the stock. It did mention, however, various other Melon assets, including "instruments" and all "rights . . . to the payment of money." It also specified that Karger would receive a security interest in all such assets "hereinafter acquired." Apparently, Pellegrino did not repay the loan, for the parties agree that three years later Melon owed Karger about $500,000. In early 1987, Melon sold its leases and stock to third party buyers for $430,000. At the closing, on February 27, 1987, Melon transferred the leases and stock to the buyers; the buyers gave Melon's clerk checks -4- 4 totalling $430,000; the clerk endorsed the checks to Karger in partial satisfaction of Melon's debt; and Karger (through an agent) took the checks and deposited them in his account. Within a year Melon, too, was bankrupt. Melon's bankruptcy trustee, noting that Karger was an "insider" and that the February 27, 1987 transfer took place within the year preceding bankruptcy, claimed that the transfer was an unlawful "preference," which Karger must return to the bankruptcy estate. 11 U.S.C. 547(b). As we have said, the bankruptcy court found that the transfer constituted a preference; the district court affirmed; and Karger now appeals. II Analysis ________ A "preference" is a transfer of a debtor's assets, during a specified pre-bankruptcy period, that unjustifiably favors the transferee over other creditors. See 4 Collier on ___ __________ Bankruptcy 547.01 at 547-14 (15th ed. 1992) ("A preference __________ is an infraction of the rule of equal distribution among all creditors."). The preference section of the Bankruptcy Code permits the bankruptcy trustee to "avoid any transfer of property" made (1) to an "insider" creditor; (2) on account -5- 5 of "an antecedent debt;" (3) while the debtor was insolvent; (4) within one year before the filing of the bankruptcy petition; (5) that enables the creditor to receive more than he would have received in liquidation in the absence of the transfer. 11 U.S.C. 547(b). We assume that the transfers to Karger satisfy the first three criteria (insider, antecedent debt, and insolvency). And, February 1987 was within one year of Melon's bankruptcy filing. But what about the final requirement? Did the transfer of the $430,000 unjustifiably favor Karger by giving him more than he would have received in liquidation? Karger must concede that in February 1987 he received $430,000 that would otherwise have gone to Melon. But, Karger makes an argument that we simplify, place within the relevant legal context, and paraphrase, as follows: 'The funds that Karger received amounted to no more than he would have received anyway in liquidation, in the absence of the transfer. In a Chapter 7 liquidation, a secured creditor normally receives the value of the property in which he holds perfected security interests (at least where no other creditor enjoys a higher priority). 4 Collier on __________ Bankruptcy 547.08 at 547-43 (15th ed. 1992); see also 11 __________ ___ ____ U.S.C. 544 (trustee in bankruptcy has status of lien -6- 6 creditor under state law); Mass. Gen. L. ch. 106, 9- 301(1)(b), (3) (lien creditor receives priority over secured creditor only if such creditor's interest is unperfected). And (says Karger), Karger was a secured creditor with perfected security interests, both in Melon's "instruments," (namely, the buyers' checks that Melon endorsed to Karger) and in "rights to money," (namely, Melon's rights to payment for the leases and stock that Melon sold). Thus, (concludes Karger) the February 1987 transfer did not give Karger more than that to which he would anyway (in liquidation) have been entitled.' We cannot accept this argument, for we do not agree that Karger held a perfected security interest, either in "instruments" or in "rights to money" that would entitle him to obtain the $430,000 ahead of other creditors in liquidation. That is because the creation of a perfected security interest in property is itself a preference when ______ the creation or perfection takes place during the preference period (and the other criteria are satisfied). See In re ___ _____ Taco Ed's, 63 Bankr. 913, 925 (N.D. Ohio 1986) and cases _________ cited therein; 11 U.S.C. 101 (defining "transfer" broadly to include "retention of title as a security interest"); 4 Collier on Bankruptcy 547.03 at 547-18 (15th ed. 1992) ______________________ -7- 7 ("transfer" encompasses any transfer of an interest in property). Although Karger received perfected security interests in the checks and rights to money, those interests were transferred in February 1987, during the preference period, and not before. Karger's basic strategy is the following: (1) He claims that he obtained a security interest (a) in Melon's rights to money from the buyers of its leases and stock and (b) in the checks that the buyers gave Melon. He notes that Melon's right to money arose out of its sales contract and existed despite the receipt of the checks, until the checks were honored. Cf. Barnhill v. Johnson, 112 S. Ct. 1386 __ ________ _______ (1992) (transfer of assets takes place when creditor's bank receives funds and credits his account, not when check is initially received). (2) He points to his security agreement's coverage of "instruments" and "rights to money," to its "after-acquired property" clause, and to the Uniform Commercial Code provision that creates a perfected security interest in collateral covered by that clause dating from ____ the time of filing of the U.C.C. financing statement. Mass. ____________________________________________________ Gen. L. ch. 106, 9-204(1) ("A security agreement may provide that any or all obligations covered by the security agreement are to be secured by after-acquired collateral . . -8- 8 . ."); Mass. Gen. L. ch. 106, 9-302, 9-304 (setting out U.C.C. filing requirements). (3) He concedes some difficulty in applying this provision to his security interest in the checks in light of other U.C.C. provisions that normally date perfection of security interests in instruments from the time of physical possession. Mass. Gen. L. ch. 106, 9-304(1). But, he says, the "relation-back" applies, at least, to his security interest in the "rights to money." And, (4) it means that the bankruptcy trustee must consider the "transfers" to him of the perfected security interests (at least in the "rights to money") to have taken place in 1984, well before the preference period began to run. Hence, (5) the February 1987 actual transfer of funds (presumably from the buyers' bank accounts to Karger's bank account) gave him nothing beyond that to which he was entitled (by a pre-1987 perfected security interest) in its absence. This result makes one hesitate. Can a creditor (say, a creditor without fraudulent intent who is, like Karger, able to control a debtor corporation), up to the very moment of bankruptcy, simply exchange the corporation's unsecured assets for assets covered by a previously executed security agreement's after-acquired property clause and -9- 9 thereby obtain those assets ahead of unsecured creditors? The answer to this question, in general, is "no." The fatal flaw in Karger's argument is that a perfected security interest in Melon's after-acquired "rights to money" may relate back to his 1984 U.C.C. (security agreement) filing for U.C.C. security interest priority purposes. The ___________________________________________________ interest does not relate back to 1984, however, for ___ ___ Bankruptcy Code preference purposes. ___________________________________ In order to obtain the "relation back" that he needs, Karger would have to argue successfully that his secured interest in "rights to money" fits within the special exception for "receivables" (and "inventory") in the Bankruptcy Code's preference section. 11 U.S.C. 547(c)(5). That exception recognizes that a company's specific receivables (and inventory) tend to turn over, often quickly, as the company collects the receivables due (say, from the sale of goods) in one year and (through more sales) generates more receivables due the next year. The exception essentially permits a creditor with, say, a "floating lien" on the "receivables" of such a company to maintain that lien as the specific accounts receivable are paid off, and replaced by new ones, without fear that a future bankruptcy trustee will mount a preference attack on new accounts -10- 10 receivable arising during the "preference" period. The exception protects new receivables from preference challenges, however, only insofar as they substitute for old __________ ones. Insofar as the grant of a security interest in the new collateral (receivables or inventory that comes into existence during the preference period) improves the ________ creditor's position (compared to his position at the beginning of the preference period), the grant of security constitutes a preference to the extent of the improvement. 11 U.S.C. 547(c)(5). See generally 4 Collier on ___ _________ ___________ Bankruptcy 547.13 at 547-59-61 (15th ed. 1992) (explaining __________ the "improvement in position" test). The "rights to money" arising from Melon's sale of its leases and stock fall within the literal scope of the Bankruptcy Code's definition of "receivable," namely a "right to payment, whether or not such right has been earned by performance." 11 U.S.C. 547(a)(3). Nonetheless, Karger cannot take advantage of this exception because he fails the "improvement in position" test. Karger began the preference period with his $500,000 debt totally unsecured. He himself argues that he ended the period with $430,000 in "rights to money" securing that same debt. Consequently, he improved his position vis-a-vis other creditors by that same amount. -11- 11 Thus, the special exception for "receivables" cannot help him. There is another reason why the exception may not help him. To apply the Bankruptcy Code's definition of "receivable" literally, to cover Melon's rights, would extend the special exception for "receivables" well beyond the kind of receivables that tend to turn over, in a flow, as a firm collects old accounts and generates new ones -- the kind of "accounts receivable" to which the U.C.C. refers through its related definition of "account." See Mass. Gen. ___ L. ch. 106, 9-106 (defining "account" more restrictively, as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance"). And, we are uncertain just how far the Bankruptcy Code definition of "receivable" is meant to extend the scope of the "receivables" preference exception. We have not found authority for the proposition that the exception extends to a single right to payment arising from a major corporate change outside of the ordinary course of business -- such as a debtor's sale of all its major assets, as occurred here. The definition of "receivable" under the Bankruptcy Code is not settled law. Cf. Vern Countryman, __ -12- 12 Andrew L. Kaufman, & Zipporah Batshaw Wiseman, Commercial __________ Law 288 (2d ed. 1982) (noting uncertainty as to whether ___ 547(a)(3)'s definition of "receivable" includes chattel paper and instruments). The issue has not been argued. Given the fact that, even if the "receivables" exception applied, Karger would fail the "improvement in position" test to the extent of his entire security interest, we need not answer the question of how far the Bankruptcy Code definition of "receivable" departs from the U.C.C. definition of "account." And, we state expressly that we do not do so. Since Melon's "rights to money" do not fall within the special "receivables" exception, they come within the scope of a more general "preference" provision that states, "a transfer is not made until the debtor has acquired rights ______ in the property transferred." 11 U.S.C. 547(e)(3) (applicable to all after-acquired property with the exception of inventory and receivables, which are governed by 547(c)(5)). The object of this statutory language is to "prevent[] after-acquired property from being deemed perfected at the date of the original security agreement." 4 Collier on Bankruptcy 547.19 at 547-85 (15th ed. 1992); _____________________ In re Northwest Electric Co., 84 Bankr. 400, 403 (W.D. Pa. _____________________________ -13- 13 1988); In re R & T Roofing Structures, 42 Bankr. 908, 912 ________________________________ n.11 (D. Nev. 1984). Thus, Massachusetts commercial law might give Karger priority over a similar creditor with a later-filed security interest. But, regardless, for ___ purposes of determining bankruptcy preferences, the transfer ______________________________________________ of the perfected security interest to Karger did not take place before Melon acquired the "property" in question. Melon's rights to money arose (and it obtained the checks) in February 1987. Hence, any perfected security interest that Karger obtained in that property amounted to a "transfer" to him of that interest in February 1987, during the preference period, not in 1984. The upshot of this analysis is that the transfers of security interests were voidable preferences. Therefore, Karger was an unsecured creditor of Melon. As an unsecured creditor, Karger would not have received in liquidation what he received through the February 1987 money transfer. Hence, the February 1987 transfer of $430,000 from the buyers to Karger was, like the transfer of security interests, a voidable preference. III Summary Judgment ________________ -14- 14 Karger also disputes a matter that until now we have assumed in favor of the trustee, namely, that at the time of transfer (February 1987) Melon was insolvent. The trustee moved for summary judgment on this point. In doing so, he noted that Melon owed Karger $500,000 and he pointed to other proofs of claim amounting to about $342,000. The trustee also stated that Melon had assets worth about $430,000. Cf., e.g., In re Lewis, 80 Bankr. 39, 40 (E.D. ___ ____ ____________ Pa. 1987) (proof of claim is competent evidence when offered against a debtor); In re Trans Air, 103 Bankr. 322, 325 ________________ (S.D. Fla. 1985) (court adjudicating a preference challenge can take notice of debtor's schedule of debts to determine insolvency issue); In re F.H.L., Inc., 91 Bankr. 288, 295 ___________________ (D.N.J. 1988) (same). Fed. R. Civ. P. 56 (made applicable by Bankruptcy Rule 7056) requires a party opposing a motion for summary judgment to "set forth specific facts showing that there is a genuine issue for trial." Fed R. Civ. P. 56(e). The only specific fact that Karger set forth consists of his statement in an affidavit that Melon had owned various pieces of furniture, equipment, and other items that Karger's brother, who operated Melon, stole. We can read the affidavit as pointing to a Melon asset that the trustee -15- 15 did not take into account, namely, a claim that Melon may have against Karger's brother for the value of stolen furniture and equipment. But, we cannot read that affidavit as setting forth specific facts indicating that this asset is worth a significant amount of money. Consequently, the court correctly concluded that Karger had failed to raise a "genuine" issue of "material" fact in respect to insolvency. One final point: appellant argues that the judgment was not sufficiently "final" to permit the appeal. See 28 U.S.C. 1291. The record reveals, however, that the ___ district court, on December 13, 1991, entered a final judgment appealable under Fed. R. Civ. P. 54(b), along with the statement of reasons that the rule requires. Any claim of non-appealability is without merit. The judgment of the district court is Affirmed. ________ -16- 16