UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 96-1395

PETITIONING CREDITORS OF MELON PRODUCE, INC.,

Appellants,

v.

JOSEPH BRAUNSTEIN, TRUSTEE, ET AL.,

Appellees.



No. 96-1406

MELON PRODUCE, INC.,

Plaintiff - Appellant,

v.

PETER KARGER,

Defendant - Appellee.



APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge] 



Before

Selya, Circuit Judge, 

Campbell, Senior Circuit Judge, 

and Boyle,* Senior District Judge. 


 

* Of the District of Rhode Island, sitting by designation.

Richard L. Blumenthal, with whom Peter L. Zimmerman and 
Silverman & Kudisch, P.C. were on brief for appellants. 
Alan M. Spiro, with whom Andrew D. Cummings and Friedman & 
Atherton were on brief for appellee Peter Karger. 



May 8, 1997


-2-

BOYLE, Senior District Judge. In this action, a BOYLE, Senior District Judge. 

Bankruptcy Court decision allowed the unsecured claim of a

creditor who had obtained a preferential transfer. The

petitioning unsecured creditors appealed to the District Court

the Bankruptcy Court's ruling that the unsecured creditor's claim

should neither be denied nor equitably subordinated. The

District Court dismissed the petitioning unsecured creditor's

appeal for failure to prosecute. The petitioning unsecured

creditors now claim that the District Court erred in dismissing

their appeal. We affirm the Bankruptcy Court's determination.

I. BACKGROUND I. BACKGROUND

In August 1984, Karger, the unsecured creditor, loaned

$632,000 to A. Pellegrino & Son, Inc. ("Pellegrino"). Melon

Produce, Inc. ("Melon Produce") was incorporated to secure

Karger's loans to Pellegrino, then in a proceeding under Chapter

11 of the Bankruptcy Code. Karger was Melon Produce's president

and sole shareholder. The Bankruptcy Court approved Karger's

loans, the transfer of three shares of stock in the New England

Produce Center ("NEPC") and leasehold interests in three bays at

NEPC from Pellegrino to Melon Produce for the purpose of securing

Karger's loans, and Melon Produce gave a guaranty and security

interest to Karger which included all "instruments" and "all . .

. rights . . . to the payment of money" including a security

interest in "all such assets hereinafter acquired." The three

-3-

bays and the shares of stock were not included in the security

interests identified. On February 27, 1987, Melon Produce sold

its three bays and shares of NEPC stock and paid Karger, its only

secured creditor, $430,022.39 from the proceeds.

Within a year of the payment to Karger, an involuntary

proceeding against Melon Produce under Chapter 7 of the

Bankruptcy Code was initiated by three unsecured creditors. On

March 22, 1990, Joseph Braunstein, the Chapter 7 Trustee for

Melon Produce ("Trustee"), brought an action against Karger in

the Bankruptcy Court. The complaint alleged a preferential

transfer and a fraudulent transfer of property of the estate

under the Bankruptcy Code and a fraudulent transfer under

Massachusetts state law. 

The proceeding was transferred to the District Court.

On January 8, 1991, the District Court granted the Trustee's

motion for entry of final judgment as to Count I, the preference

claim, and the Trustee's motion for assessment of prejudgment

interest. The District Court entered final judgment on the

merits, awarding damages on Count I in the amount of $430,022.39

plus pre-judgment interest in the amount of $29,838.39. All

other counts were dismissed. On September 29, 1992, the final

judgment was upheld upon appeal by this Court. In re Melon 

Produce, Inc., 976 F.2d 71 (1st Cir. 1992). 

The Trustee and Karger agreed to a Stipulation of

Settlement on June 18, 1993. The Trustee had filed a post-

judgment motion to require Karger to satisfy the indebtedness,

-4-

and sought the appointment of a Special Master for the purposes

of taking possession of and selling shares of stock held by

Karger in two unrelated corporations. The Trustee also had

brought an action seeking to set aside as a fraudulent conveyance

the interest of Karger's wife, Susan Karger, in certain real

property held by her and Karger as tenants-by-the-entirety. 

The stipulation stated that Karger had asserted and

represented that he was unable financially to satisfy the

judgment in full. In support of this assertion, Karger made

certain financial disclosures to the Trustee, including

submitting to a deposition by the Trustee and producing his tax

returns and other work papers for review by the Trustee. Karger

offered to pay the sum of $400,000, in satisfaction of the

judgment and his and his wife's obligations and indebtedness to

the Trustee. Due to the uncertainty with respect to Karger's

financial situation and the question of Karger's ability to

satisfy the judgment, and given the uncertainty with respect to

the valuation of Karger's stock in the unrelated corporations,

the Trustee agreed to seek the approval of Karger's $400,000

offer from the Bankruptcy Court according to the following terms:

If the Settlement Amount is paid [by
Karger] on or before the Settlement Date,
the Trustee shall accept such payment in
satisfaction of Karger's obligations, and
the Trustee shall mark the judgment and
any execution therefor 'satisfied' and
return same to Karger. . . . If Karger
pays the Settlement Amount by the
Settlement Date, the Trustee shall not
object to the allowance of Karger's
unsecured claim in the amount of
$400,000. . . . If this settlement is not

-5-

approved by the Bankruptcy Court or if an
appeal is taken from an order approving
this settlement and the order is stayed,
then at the sole option of the Trustee,
the Trustee may declare the Stipulation
and settlement null and void.
Thereafter, the Trustee may pursue his
rights and remedies against Karger,
including, but not limited to, the
appointment of the Special Master to sell
the [corporate] stock of Karger and the
fraudulent conveyance action against
Peter and Susan Karger. 

The petitioning unsecured creditors filed an objection

to the Trustee's motion to approve the settlement stipulation,

seeking the denial of the Trustee's application for approval of

the stipulation, or, in the alternative, the equitable

subordination of Karger's unsecured claim to the claims of the

other unsecured creditors. On July 22, 1993, the Bankruptcy

Court heard the motion and approved the settlement. The

unsecured creditors argued that the settlement should not be

approved because the settlement provided that the Trustee would

not object to Karger's unsecured claim of $400,000 and Karger was

to pay less than the full amount of the preference judgment. The

trustee advised the Bankruptcy Court that he did not wish to

pursue equitable subordination of Karger's $400,000 claim

because, having succeeded on the issue of preferential transfer,

he did not want to go through ". . . another war." The

Bankruptcy Court stated that 11 U.S.C. 502(d) permits the

petitioning unsecured creditors to object to the allowance of the

claim stating that "[y]ou could press that [claim for equitable

subordination] even if the trustee rolls over and plays dead" and

-6-

that they, the objecting unsecured creditors, "can come in and

ask for equitable subordination." The context of the court's

statement is clear that objections to Karger's unsecured claim

could be made later "and we'll have a hearing on that." The

petitioning unsecured creditors did not appeal the Bankruptcy

Court's order approving the settlement. On September 2, 1993,

Karger paid the $400,000 settlement to the Trustee.

The petitioning unsecured creditors then filed an

objection to Karger's claim in Bankruptcy Court. On November 26,

1993, the petitioning unsecured creditors filed a Motion for

Summary Judgment in Bankruptcy Court, arguing that Karger's

unsecured claim should be denied pursuant to 11 U.S.C. 502(d),

or, in the alternative, that Karger's claim should be equitably

subordinated pursuant to 11 U.S.C. 510(c). The creditors

argued that the claim should be disallowed because Section 502(d)

states that "the court shall disallow any claim of any entity

from which property is recoverable . . . unless such entity or

transferee has paid the amount, or turned over any such property,

for which such entity or transferee is liable." The unsecured

creditors argued that Karger's unsecured claim should be

disallowed because the full amount of the judgment against

Karger was in fact not paid. 11 U.S.C. 502(d).

The unsecured creditors also argued that Karger's claim

should be subordinated to their unsecured claims. This action

would increase the dividend to the unsecured creditors other than

-7-

Karger. Section 510(c) authorizes the Bankruptcy Court to apply

equitable subordination principles to claims.

On December 28, 1993, the Bankruptcy Court denied the

Motion for Summary Judgment and entered an order allowing

Karger's unsecured claim in the amount of $400,000. See In re 

Melon Produce, 162 B.R. 386 (Bankr. D. Mass. 1993). The Court 

found that the petitioning unsecured creditors' Section 502(d)

argument failed on the grounds that Karger had paid the full

amount of the $400,000 settlement, that the Bankruptcy Court's

order approving the settlement stipulation had adjusted the

amount of the preference downward, and that "to rule otherwise

would deprive the settlement of its essential vitality." As to

the petitioning unsecured creditors' Section 510(c) argument, the

Court found that "[t]he claims are primarily derivative from the

same facts set forth in the Trustee's complaint seeking to avoid

a fraudulent transfer. While the Trustee did not seek equitable

subordination of Karger's claim . . . he might well have done so

based upon the facts of the matter, and res judicata bars all

available grounds for recovery, regardless of whether or not

asserted." The Bankruptcy Court cited this court's opinion in

Bezanson v. Bayside Enterprises, Inc. (In re Medomak Canning), 

922 F.2d 895 (1st Cir. 1990), and concluded that "the previous

settlement precludes the [petitioning unsecured creditors] from

raising the issues of equitable subordination at this time." 

The petitioning unsecured creditors then appealed to

the District Court from the denial of Summary Judgment. On April

-8-

7, 1994, the District Court affirmed the Bankruptcy Court's

ruling on the issues relating to the effect of the failure to pay

the full amount of the judgment against Karger and "remanded to

the Bankruptcy Court the issue of whether [the petitioning

unsecured creditors] should be allowed to object to Karger's

claim on equitable subordination grounds."

On July 5, 1995, the Bankruptcy Court issued a

Memorandum Decision, in which it ruled that the petitioning

unsecured creditors were precluded by the settlement from

objecting to Karger's unsecured claim. In its Decision, the

Bankruptcy Court resolved the uncertainties created by its

utterance of July 22, 1993 and its published decision of December

28, 1993. The Court stated that its initial pronouncement on

July 22, 1993, which stated that 11 U.S.C. 502(a) permits the

petitioning unsecured creditors to object to the allowance of the

claim and that the petitioning unsecured creditors could ask for

a hearing on the equitable subordination issue, was in error.

With the benefit of the motions for summary judgment, the

Bankruptcy Court had come to the opposite conclusion in its

published decision of December 28, 1993. In that decision, the

Bankruptcy Court held the petitioning unsecured creditors were

precluded from raising [the equitable subordination] issue, based

primarily upon this court's opinion in In re Medomak Canning. 

The Bankruptcy Court now upheld the December 28, 1993 decision,

holding that In re Medomak Canning was controlling and that the 

petitioning unsecured creditors were not entitled to pursue the

-9-

equitable subordination issue further. The court then cited

Grella v. Salem Five Cent Savings Bank, 42 F.3d 26, 30 (1st Cir. 

1994), without discussion.

On July 14, 1995, the petitioning unsecured creditors

again appealed their equitable subordination claim to the

District Court. The Bankruptcy Court gave notice to the parties

of the appeal timetable on July 17, 1995. On September 5, 1995,

the record for the case on appeal was assembled and transmitted

to the District Court. Although the District Court did not issue

a notice to the parties of the entry of the appeal on the docket,

the petitioning unsecured creditors had actual knowledge for

several months of the docketing of the appeal. Since the filing

of the appeal, the petitioning unsecured creditors had been

monitoring the status of the proceeding on the Court's computer-

operated Pacer System.

The petitioning unsecured creditors did not file and

serve a brief within fifteen days after the entry of the appeal

on the District Court docket, as required by Bankruptcy Rule

8009. On February 27, 1996, the District Court entered an order

dismissing the appeal for the petitioning creditors' failure to

prosecute the appeal. The petitioning unsecured creditors then

filed a notice of this appeal to this Court.

II. DISCUSSION II. DISCUSSION

-10-

Although this appeal initially presents the issue of

whether actual as opposed to record notice triggers the 15 day

period for the filing and service of an appellant's brief in the

District Court, we choose to forego that issue and address the

substantive underlying issues. While it is true that federal

courts of appeal generally do not rule on issues not decided in

the district court, we do have discretion to address issues not

reached by the district court when the question is essentially

legal and the record is complete. U.S. v. L.I. Kin-Hong, No. 97- 

1084, slip op. at 31 (1st Cir. Mar. 20, 1997) (citations

omitted). Here, the substantive underlying issues are legal in

nature and the record is complete. Furthermore, this cause has

already involved the attention of this court on an earlier

occasion. We address the substantive underlying issues in the

hope that this litigation may sooner, rather than later, come to

a conclusion.

A. Disallowance of Claim A. Disallowance of Claim

The petitioning unsecured creditors argue that Karger's

claim should be disallowed, as Karger received a judicially

determined preferential transfer and has not paid the amount for

which he is liable because of the preferential transfer. Section

502(d) of the Bankruptcy Code governs the disallowance of claims.

It reads as follows:

(d) Notwithstanding subsections (a) and (b) of
this section, the court shall disallow any claim of any
entity from which property is recoverable under section
542, 543, 550, or 553 of this title or that is a

-11-

transferee of a transfer avoidable under section
522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of
this title, unless such entity or transferee has paid
the amount, or turned over any such property, for which
such entity or transferee is liable under section
522(i), 542, 543, 550, or 553 of this title. 

In 1992, this court held that Karger was the recipient of a

voidable transfer. See In re Melon Produce, 976 F.2d at 76. 

The remaining issue, therefore, is to determine if

Karger, as transferee, has paid over the amount for which he is

liable under 11 U.S.C. 550. Petitioning unsecured creditors

argue that Karger did not comply with the requirements of Section

502(d) because he did not pay the full amount of the judgment of

$459,860.78 plus interest but rather settled the claim against

him by means of a payment of a lesser sum, $400,000.

The legal query presented appears to be unique since

the parties have not cited nor have we found any authority which

specifically addresses the precise issue presented here. Thus,

we are left to the task of ascertaining the legislative purpose

and intent, if possible, from the language employed by Congress.

As we have stated previously, "'the task of interpretation begins

with the text of the statute itself, and statutory language must

be accorded its ordinary meaning.'" In Re: Juraj J. Bajgar, 104 

F.3d 495, 497 (1st Cir. 1997), quoting Telematics Int'l, Inc. v. 

NEMLC Leasing Corp., 967 F.2d 703, 706 (1st Cir. 1992). Wherever 

possible, statutes should be construed in a commonsense manner,

avoiding absurd or counterintuitive results. U.S. v. Carroll, 

105 F.3d 740, 744 (1st Cir. 1997) (citations omitted). 

-12-

The language of Section 502(d) of the Bankruptcy Code

is not complex. A proof of claim must be disallowed unless the

preference recipient pays the amount for which he is "liable"

under 11 U.S.C. 550. See 11 U.S.C. 502(d); Max Sugarman 

Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1257 (1st 

Cir. 1991). Once the preference recipient complies with the

payment or turnover order of the bankruptcy court, it may file a

proof of claim. See Sugarman, 926 F.2d at 1257; see also In re 

First Intern. Services Corp., 37 B.R. 856, 860 (Bankr. D. Conn. 

1984) ("Pursuant to 11 U.S.C. 502(d), claims of creditors who

have received void or voidable transfers must be disallowed

unless the creditor surrenders the money or property transferred

during the preference period.").

The key phrase in this inquiry is "the amount . . . for

which such entity or transferee is liable . . ." 11 U.S.C.

502(d). The difficulty with application of the term "liable"

namely is that there are two court actions which determined that

the preference recipient is liable, the judgment of the District

Court and the Order of the Bankruptcy Court approving the

settlement of the preference claim.

The unsecured creditors argue that the legislative

history of Section 502(d) is relevant to this inquiry. The

ambiguity is not clarified by reference to the legislative

history. In part, that history states: "Subsection (d) . . .

requires disallowance of a claim of a transferee of a voidable

transfer in toto if the transferee had not paid the amount or 

-13-

turned over the property received as required under the sections

under which the transferee's liability arises." H.R. Rep. No.

95-595, at 354 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6310

(emphasis added). The petitioning unsecured creditors argue that

the inclusion of the words "in toto" indicates that Congress

intended that a creditor must relinquish the original preference

amount, precluding any judicial adjustment of this figure. They

also cite a North Dakota Supreme Court case as support for this

proposition that a creditor must surrender all sums previously 

transferred. See North Dakota Public Service Com'n v. Central 

Sales Grain, Inc., 371 N.W.2d 767, 780 (N.D. 1985) (emphasis 

added).

This opinion considered a state insolvency proceeding

brought against a grain warehouseman. The court concluded that

the claim of a creditor should be denied because the creditor had

received a vaculator machine1 as a preferential transfer and had

not returned it. The creditor claimed that he had "since" paid

for the machine (apparently after the record was closed in the

proceedings below). The court stated that the creditor could

bring an appropriate motion for relief after its mandate issued.

Although there is an obvious difference between the return of a

 

1 Although the term 'vaculator' is used sometimes to describe
surgical devices for the removal of fluid from the human body and
the like, in this context a 'vaculator machine' describes a
system used to extract grain from containers and transfer it to
other storage facilities. See Bunge Corp. v. American Commercial 
Barge Line Co., 630 F.2d 1236, 1241 (7th Cir. 1980); Mercantile 
National Bank of Chicago v. Quest, 303 F. Supp. 926, 928 (N.D. 
Ind. 1969). 

-14-

tangible piece of machinery which Section 502(d) would seem to

require (although we do not now determine that issue) and the

payment of all or part of a monetary sum, there is nothing in the

court's opinion which supports the contention that an unsecured

creditor may file a claim only if the judgment against the

creditor for a preferential transfer of money is paid in full.

The legislative history thus becomes pertinent to our

analysis, even if it does not pinpoint a specific result. The

unsecured creditors place emphasis upon the use of the term "in

toto" in the House of Representatives historical record. What

the unsecured creditors have overlooked is the fact that the term

"in toto" refers to the unsecured claim of the recipient of a

preferential transfer and not, as they would have it, the amount

for which the transferee is liable. Thus, this legislative

history does not clarify the purpose of Congress.

We must ask, how would Congress have answered this

question? Guided by the actual language used, we may look to the

practical effect of the arguments made. See Dames & Moore v. 

Regan, 453 U.S. 654, 673-74 (1981); Chapman v. Houston Welfare 

Rights Org., 441 U.S. 600, 616 (1979). There is guidance in the 

cogent language used by the Bankruptcy Court that to accept the

unsecured creditors' contentions would rob post-judgment

settlements of their "essential vitality." See In re Melon 

Produce, 162 B.R. at 388. It is an unfortunate axiom that a 

judgment does not always guarantee collection. Indeed, the

easiest judgment to obtain is usually one that will never be

-15-

paid. The circumstances of the settlement with Karger suggest

that collection of the full amount could have been an impossible

task and could have involved the estate in lengthy, expensive

litigation to the detriment of the unsecured creditors. 

Thus a construction of the statute which requires the

last penny to be paid could cause the unsecured creditors to, in

effect, submit to an all-or-nothing situation. The petitioning

unsecured creditors' argument would preclude half or any part of

the loaf from being satisfactory, thereby preventing the bankrupt

estate from being at least partially nourished. The purpose

ought to be to encourage the collection of the largest amount

possible to provide a dividend or a better dividend to the

unsecured creditors.

Experience suggests that few unsecured creditors can

expect satisfaction of their claims in whole or in substantial

part. More than two decades ago it was reported that unsecured

creditors in business bankruptcies receive an average of 8% of

the amounts proved and allowed, while general creditors in

personal bankruptcies receive an average of 7% of their allowed

claims. See David Stanley & Marjorie Girth, Bankruptcy: Problem, 

Process, Reform 130 (1971). There is nothing to signify that 

there has been any recent substantial improvement in the extent

of the recoveries of unsecured creditors. The Administrative

Office of the U.S. Courts reports a higher average dividend in

Chapter 11 reorganization cases - 32% - but that figure includes

both the amounts actually paid and the amounts that debtors

-16-

promised to pay after the reorganization case was closed. See 

Admin. Office of the U.S. Cts., Tables of Bankruptcy Statistics

A-32 (1978). However, the latter may be merely paper obligations

which may be discounted again in a recurrence of the debtor's

financial difficulties. See id. Despite the lack of any recent 

empirical studies, certainly it is safe to expect that in almost

every bankruptcy unsecured creditors are likely to receive only a

small percentage of their legitimate claims.

The estate is protected against manipulation because

settlements must be approved by the Bankruptcy Court after a

consideration of the circumstances of the settlement. Approval

is a discretionary function and may be reviewed for abuse.

Hence, a small settlement which results in a substantial dividend

to the preferential transferee is not likely to pass muster.

Finally, this result is consistent with the overall

purpose of Section 502, which was not "to punish, but to give

creditors an option to keep their transfers (and hope for no

action by the trustee) or to surrender their transfers and their

advantages and share equally with other creditors." Tidwell v. 

Atlanta Gas Light Co. (In re Georgia Steel, Inc.), 38 B.R. 829, 

839 (Bankr. M.D. Ga. 1984). Karger chose the latter option and

paid $400,000 to the Trustee. If faced with the option of paying

the full amount of the judgment in order to file his claim as an

unsecured creditor (apart from whether or not he had the

wherewithal to do so), the result might well have been a lengthy

and only partially successful or even an unsuccessful effort to

-17-

obtain satisfaction of the judgment in full. The expenses

incurred to collect the judgment in full or in part could have

diminished the return to the estate to less than $400,000. The

practical effect of the position advocated by the petitioning

unsecured creditors compels us to conclude that Congress did not

intend that unsecured creditors be denied their claims, if having

received a preferential transfer, they do not satisfy a judgment

arising out of the transfer in full and with interest. We

believe that Congress intended some play in the joints and that a

court-approved settlement of such a judgment satisfies the

requirement that the preferential transferee has paid that for

which he is liable. We therefore agree with the Bankruptcy

Court. We hold that pursuant to Section 550(a)(1) Karger was

liable for the sum of $400,000 and therefore his unsecured claim

was properly allowed. 

B. Equitable Subordination B. Equitable Subordination

The ultimate ruling of the Bankruptcy Court was that

the unsecured creditors were barred by the approval of the

settlement between Karger and the Trustee. Bankruptcy Court Rule

9019 requires notice to interested parties prior to approval of a

settlement. See 11 U.S.C. Part IX, Rule 9019(a). The rule was 

complied with since the petitioning unsecured creditors had

notice of and did in fact appear and object to the proposed

settlement. The unsecured creditors vigorously pressed their

argument that Karger's unsecured claim should be subordinated to

-18-

their unsecured claims. The Bankruptcy Court approved the

settlement which included a provision that "the Trustee shall not

object to the allowance of Karger's unsecured claim in the amount

of $400,000." The unsecured creditors did not appeal from the

approval of the settlement agreement between the Trustee and

Karger. Although the Bankruptcy Judge stated that the

petitioning unsecured creditors could ask for a later hearing on

the equitable subordination issue, this statement was in error.

Counsel should not take such a prediction by a judge as

gospel, but should act diligently to protect the record and his

or her client's right to appeal. See Morrissey v. Nat'l Maritime 

Union of America, 544 F.2d 19, 32 (2d Cir. 1976) ("While counsel 

seeks to excuse [the failure to make an offer of proof] on the

basis of the judge's statement on the telephone . . . this did

not relieve counsel of his duty to protect the record.").

Counsel must not rely upon the judge to make the case for him or

her. As observed in Marshak v. Tonetti, "[j]udges from time to 

time will make mistakes. Parties should not sit idly by, failing

to point out relevant authority and then hope for redress on

appeal." Marshak v. Tonetti, 813 F.2d 13, 17 (1st Cir. 1987). 

If the equitable subordination issue was to be considered at all,

it should have been addressed at the time of the settlement.

Otherwise, there is no reason for a settlement, since the

settling parties are neither protected from further unfavorable

consequences nor allowed to enjoy the safe harbor of their

settlement arrangement.

-19-

Furthermore, the principles of res judicata dictate

that the petitioning unsecured creditors should not be permitted

to bring this issue on appeal. "Under res judicata, a final

judgment on the merits of an action precludes the parties or

their privies from relitigating issues that were or could have

been raised in that action." Allen v. McCurry, 449 U.S. 90, 94 

(1980), citing Cromwell v. County of Sac, 94 U.S. 351, 352 

(1876); see also Montana v. United States, 440 U.S. 147 (1979). 

In this case, the fate of the petitioning unsecured creditors'

equitable subordination claim is affected by the fact that they

were in privity with the Trustee.

In In re Medomak Canning, this court discussed the 

standard by which the relationship between a trustee in

bankruptcy and a creditor should be evaluated. A trustee in

bankruptcy is a fiduciary representing the estate and creditors.

In re Medomak Canning, 922 F.2d at 901, citing In re Thu Viet 

Dinh, 80 B.R. 819, 822 (Bankr. S.D.Miss. 1987). Privity may be 

established by identification of interests, even where

representation of those interests is not authorized. In re 

Medomak Canning, 922 F.2d at 901, citing Meza v. General Battery 

Corp., 908 F.2d 1262, 1267 (5th Cir. 1990). 

Since the petitioning unsecured creditors had notice of

the hearing on the approval of the settlement agreement, and

since they participated and argued the issue, and since the issue

they now press was considered although incorrectly passed over,

their failure to appeal thereafter is fatal to their present

-20-

appeal. The finality of court-approved settlements such as this

one is important, especially to the efficient administration of

the estate and to reassure settling parties that the trustee will

not relitigate the settled claims. See In re Medomak Canning, 

922 F.2d at 901. 

The Trustee is ordinarily the appropriate party to seek

equitable subordination on behalf of the estate and unsecured

creditors. In re Medomak Canning, 922 F.2d at 902. As unsecured 

creditors, appellants could not in these circumstances evade the

responsibility of looking to the Trustee in the first instance as

their fiduciary and representative to vindicate their interests,

including even their interest in pursuing equitable

subordination. Id. In this case, the Trustee chose not to 

petition the court for equitable subordination of Karger's claim

and that choice was approved by the Bankruptcy Court. Because

the Trustee was acting for the petitioning unsecured creditors,

they are bound by the Trustee's actions. The principles

enunciated in In re Medomak Canning, 922 F.2d 895, are 

controlling. Therefore, the petitioning unsecured creditors'

equitable subordination claim is barred by the principles of res

judicata.

III. CONCLUSION III. CONCLUSION

-21-

We affirm the District Court's judgment as to the

disallowance of Karger's claim and the dismissal of the

petitioning unsecured creditors' appeal by the District Court.

Affirmed.  

-22-